PUGET SOUND POWER & LIGHT CO. et al. v. CITY OF PUYALLUP.

No. 6369.

Circuit Court of Appeals, Ninth Circuit.

Aug. 4, 1931.

F. D. Oakley, of Tacoma, Wash., and Elmer E. Todd, Frank E. Holman, Todd, Holman & Sprague, and Clarence R. Innis, all of Seattle, Wash., for appellants.

E. K. Murray and Leo Teats, both of Tacoma, Wash., and M. F. Porter, City Atty., of Puyallup, Wash., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

This is an appeal from a judgment rendered from a condemnation proceeding brought by the city of Puyallup, a municipal corporation, to condemn a distributing system installed and owned by the Puget Sound Power & Light Company within the city limits of the city of Puyallup. The other appellants are joined because of their interest in an incumbrance upon the property. The verdict and judgment was for $216,825.67.

It is conceded that the appellants were entitled to the market value of the property taken, and, in view of the fact that appellants were the owners of a large generating and distributing system, of which the system in the city of Puyallup was a small but integral part, the appellants were also entitled to the damage to its remaining property, due to the severance of property taken.

As both parties introduced evidence as to these items, and the verdict of the jury is based upon comprehensive but conflicting testimony, that verdict is conclusive upon appeal, unless error was committed in the reception of evidence or in the court's charge to the jury. The only questions presented by the appellants relate to the proper method of ascertainment of market value and to rulings made by the trial court during the taking of the evidence. · Preliminarily, it may be stated that the evidence was full and comprehensive, that the witnesses who testified were fully advised as to the various elements of value which have been considered by the courts in condemnation proceedings, and by rate-making bodies in proceedings for the fixing of rates for public utilities, and by the courts in considering the constitutionality of the rates thus fixed. The direct and cross examination of the witnesses fully developed the opinion of such witnesses with relation to such elements of value and the reasons upon which their conclusions as to market value were based.

In addition to the witnesses who testified with reference to the market value of the entire plant to be condemned, witnesses were introduced by both parties who testified on their direct examination with reference to some of the elements of value which it had been consistently and repeatedly held are appropriate evidence to be received in ascertaining the fair value of property for rate-making purposes. As the principal questions presented by appellants relate to the sufficiency of evidence upon these elements and to the rulings of the court with relation to the introduction or rejection of such evidence, it should be stated at the outset that the problem presented in a condemnation proceeding is essentially different from that presented to a rate-making body or to the courts in the consideration of whether or not rates thus established are confiscatory. In condemnation proceedings, "just compensation" is the market value of the property taken. In rate-making cases, the standard of market value of the investment cannot be applied in determining just compensation, for the simple reason that market value is dependent upon earning capacity and fluctuates with that capacity; consequently, in determining what earning capacity is just, the market value of the investment which is a result of earning capacity cannot be utilized as a basis for the determination of what constitutes the reasonable or just earning capacity of the plant. In view of this situation,

it has been determined that the Constitution of the United States prohibiting the taking of property without compensation requires that the owners of a public utility shall not be deprived of a fair return upon the fair value of the property devoted to the public use. In arriving at the fair value of a public utility investment, the courts have gradually evolved rules with relation to the evidence pertinent to that issue. These rules which indicate the nature and character of the evidence to be considered by the rate-making body and by the courts in determining the fair value of a public utility property are largely prohibitive in character; that is to say, the courts have determined that rates cannot be fixed upon a basis which ignores certain elements of value which go to make up a fair value of the property. This process of evolving an appropriate method of valuation for rate-making purposes is still in·a state of development, and involves very great practical difficulties, some of which are not completely solved, partly for the reason that under the Constitution final authoritative decision rests in the courts which have no power to make rates and no machinery for the ascertainment of all of the complex elements entering into the determination of what constitutes a fair valuation of the property. The province of the court in such a matter is confined to the duty of preserving to the owner of property the fundamental right guaranteed to him by the Constitution that his property shall not be taken from him without just compensation, and for that purpose to prohibit the nibbling away of his property by the fixing of rates which gradually but effectively destroy the value thereof.

In the case at bar, however, we have the familiar problem of ascertaining market value where expert witnesses found by the court to be competent to express an opinion on that subject have expressed that opinion in appropriate fashion, and opposing counsel have had an opportunity for full and complete cross-examination. In such a case the function of the judge has been largely performed when he has passed upon the competence of witnesses, and then the jury must determine under appropriate instructions the weight and credibility of such evidence and render a verdict in accordance with their judgment as to the various items or claims advanced by the witnesses in support of their conclusion. This verdict upon the facts under our system is a final and conclusive determination of market value, for the same

Constitution which prohibits the taking of property without just compensation guarantees the right to a trial by jury, and this right applies to the ascertainment of market value and pertains as much to the plaintiff as to the defendant in a condemnation case. The obligation of the plaintiff in a condemnation proceeding is to pay to the owner the market value of the property to be taken as fixed by a jury in a condemnation proceeding, and the right of the defendant to just compensation in such a proceeding is to the amount so fixed by the jury. This verdict, if supported by the evidence, is binding upon the courts, both in direct and collateral attack, subject to the power of the trial judge to grant a timely and appropriate motion for a new trial. No court can know, nor is there any method of ascertaining, the basis upon which a jury arrives at its verdict fixing a lump sum for property condemned, if it is within the limits of value fixed by the evidence.

With these preliminary observations we turn to the assignments and specifications of error relied upon by the appellants in the case at bar, and we will further develop the facts as we proceed with a discussion of the legal questions involved.

▮ We will state the propositions involved on the appeal in the language of the appellants. The first point thus presented is as follows: "Appellants' Puyallup properties are in active and successful operation under franchises which have approximately twenty-five years to run. They have a value as an established and profitable enterprise over and above their reproduction and development cost. Appellants were denied the right to prove this value and were thereby denied that 'due process' of law guaranteed by the fourteenth amendment to the constitution of the United States, and the 'just compensation' guaranteed by Article I of section 16 of the constitution of the state of Washington."

In support of this proposition, the appellants discuss at some length the alleged difference between "franchise value" and "going concern value," but we will not follow this general discussion, for the reason that, as we have pointed out, such a discussion must be related to a definite assignment of error, and will therefore approach the matter from that standpoint.

Mr. C. Ray Moore, an expert witness introduced by the appellants, having testified upon direct examination as to the value of various items of personal property to be con-

demned and the cost of reproduction of the property and the value thereof less depreciation, having testified that he allowed $250 in his estimate for securing franchises in the city of Puyallup, and having indicated his method of arriving at the going concern value, and having fixed the severance damage of $24,115 by reason of the cost of construction thereby rendered necessary, testified as follows:

"In addition to these costs, which are a part of the severance damage, I have an item that represents a loss to the company in revenue should the Puyallup be severed from the Puget Sound system.

"Q. Have you taken into consideration the earnings of the company? A. Yes, sir. * * *

"Q. You have another item of severance damage here? A. Yes, sir. I have an item that represents a loss to the company in revenue should the Puyallup system be severed from the Puget Sound system.

"Q. Has that any relation to the value of this franchise? A. Yes, sir.

"Q. Does the loss of the franchise—A. It is based upon the value of the franchise.

"Q. Now, what did you determine with reference to that?

"Mr. Murray. [Appellee's counsel]— Just a minute. Is he trying to arrive at the value of the franchise of the distribution we are taking?

"Mr. Oakley. [Appellants' counsel] Yes; there are two franchises being taken.

"Mr. Murray. I thought you already testified to those.

"Mr. Oakley. No, he did not, he testified as to original cost that it would cost that to get it, the mechanics of getting the franchise was $250. He testified to no value other than the cost of getting it in cost to the company of mechanical cost of obtaining that franchise. That is all your witnesses have testified to. * * *

"Mr. Oakley. Yes, and this is being taken from them, now I am simply basing the value of that right as reflected in the earnings. I know from reading his report that is the way he has treated that—earnings of the company. It has been uniformly held that that is proper to consider.

"Mr. Murray. Is it as severance damage, or value of the property? I object to any proof of loss of profits as an element of damage. I don't quite understand—

"The Court. Well, as I understand the question and the statement, it is sought to prove a value of the franchise and property, and to argue that that is such a value in some way from the profits of the business."

This was followed by a general discussion between the court and counsel as to the right to receive the value of a franchise in a condemnation proceeding. The court sustained the objection to the question, "Now, what did you determine with reference to that?" but stated that the matter would be left open for argument. Counsel proposed the question in a new form, as follows:

"Q. Now, Mr. Moore, did you include any value for franchise in your going concern value [$30,873.45]? A. No, sir.

"Q. As I recall your testimony, you included in your estimate simply the cost of acquiring? A. That is correct.

"Q. You did not—

"The Court. As a part of the overhead? A. —not as a part of the overhead, as a part of the cost of the structural value as the actual amount of money expended in acquiring the franchise.

"You considered the earnings as testified to by Mr. Robbins here? A. Yes, sir.

"Have you considered the value of this franchise and the loss to the company by reason of the taking of the franchise in this suit, having in mind the earnings of the company both past and present and prospective—probable earnings?

"Mr. Murray. * * * I think probably we can get at it a little better on cross examination, for the reason that we will concede that the value of franchise as property is a proper element, but as ordinarily, it is merged in going concerns. Now, whether his statement is going to show that he arrived at it by capitalizing earnings, or how, I don't know, but I don't see any other way to dispose of it than to wait and see. Therefore, as far as I am concerned he can answer. A. You want the amount first, Mr. Oakley?

"Q. Yes. A. $74,192.00. I arrived at that value for the franchise by determining the loss that the company would incur annually if the company were deprived of the right to do business in Puyallup. That is based upon the structural plant depreciated, plus going concern value, which amount is $290,212. The company has been and is today earning eight per cent on the money invested in the property in Puyallup. Six per cent of that eight per cent which is being earned is to cover the cost of money that is invested in the property at Puyallup. Two per cent of the eight per cent is the net profit to the company as the result of its operations in Puyallup. The two per cent of the $290,212 is $5,804. This represents the amount that the company would lose annually if the Puyallup property is severed. This amount capitalized for the life of the franchise would be $145,100. The present worth of that amount of money is $74,192, which is the amount that I am contending is a fair and reasonable amount for severance damage Number 2.

"Q. Well, the value of the franchise? A. The value of the franchise.

"Mr. Murray. At this time, if your Honor please, we move to strike the answer of the witness given as to his reasons for arriving at the value, and the value as fixed upon the franchise for the reason that it is based upon as an improper basis. What he has done here is to take and try to capitalize certain difference in earnings, and the courts nowhere recognize the propriety of any such thing as that. He has taken the difference between what he says is the ordinary cost on the market to borrow money and what they are earning out here, but that element is included in going concern; it must necessarily be.".

Appellee moved to strike out this answer for the reason that it is based upon an improper basis. "He has taken the difference between what he says is the ordinary cost on the market to borrow money and what they are earning out here, but that element is included in going concern; it must necessarily be."

After discussion, this motion was granted. It should be said at this juncture that the witness had testified to a going concern value of $30,873.45. He arrived at this value "* * * by applying the average percentage to the structural value that is used in determining the going concern values of public utilities. I ascertained that, from going concern values that I had placed on properties that had been sold and purchased and from going concern values that had been allowed in similar companies by federal and state courts and state commissions, and by state regulatory bodies. I have attempted to use the average percentage.

"Going concern value on the electric property in Puyallup is a difference in the plant of the Puget Sound Power and Light Company as a successful public utility and a

similar plant, assembled but not yet functioning. It includes the costs which are not included in the structural value, the cost of getting customers and all items entering into making the company a going concern and a profit-making institution. The going concern value very materially depends upon the success of the business and the property. With respect to the Puyallup property I found that the company is entitled to 15 per cent of its structural value as a going concern, which on the cost of reproduction new amounts to $41,476.56. On the present depreciated structural value it amounts to $30,873.45. This makes the total under the cost of reproduction basis of structural value, plus going concern value, the sum of $317,986.99 and the present depreciated value the sum of $236,696.27.

"With reference to the allowance for going concern value, I considered allowances of which I have knowledge in the following cases: Pacific Gas and Electric Company of San Francisco was allowed 12 per cent of the physical value of its physical property. The Houston Electric Company of Houston was allowed 21 per cent by the Federal Court. The Mountain States Telephone & Telegraph Company of Utah was allowed ten per cent by the State Commission of Utah. The Hoke National Gas Company of West Virginia was allowed ten per cent by the State Commission of West Virginia. The Pioneer Telephone & Telegraph Company of Oklahoma was allowed twenty per cent by the Federal Court. The Interstate Light & Power Company of Wisconsin was allowed ten per cent by the State Commission of Wisconsin. The Public Service Company of New Jersey was allowed 14 per cent by the State Commission of New Jersey. The Indiana General Service Company of Indiana was allowed 13 per cent by the Indiana State Commission. The Appalachian Power Company was allowed 13 per cent by the State Commission of West Virginia. The Public Service Company of New Jersey was allowed 30 per cent by the State Commission of New Jersey. The Baker Utility of Montana was allowed ten per cent by the State Commission of Montana."

It is apparent from the foregoing that the witness had already testified to a valuation based upon the earning capacity of the plant in his going concern value, although, having adopted an arbitrary rule of percentages in arriving at that going concern value, the witness may not have been aware of that fact, as he had based his percentage allowance upon a large number of cases which he cited wherein the going concern value allowed by public utility commissions and courts have varied from 12 to 30 per cent. The testimony of the witness that $74,192, which represented the present worth of return of 2 per cent. upon the value of the company's property for 25 years, represented the severance damage, or the franchise value, was correctly stricken out. It tended to confuse the issue before the jury by submitting to it as distinct elements of damage a going concern value which necessarily involved earning capacity and the same earning capacity in the form of franchise value or severance damage. The ruling of the trial court was correct. Appellants followed their exception by an offer to prove with the witness "that the fair and reasonable market value of that franchise is $74,292.00." This was objected to, and the objection was sustained. But this offer must be read in light of the testimony of the witness to the effect that he ascertained the value of the franchise or the severance value by the method indicated, which was not a proper way to estimate such value.

■ Later, appellants, through their witness W. H. McGrath, vice president and manager of the Puget Sound Light & Power Company, renewed their effort to present to the jury the item of $74,292. The witness was asked the following questions:

"Q. Mr. McGrath, in your opinion what loss will the whole system of the company suffer,—now you need not answer this until counsel has objected,—I will withdraw that part of the question and repeat again. Mr. McGrath, in your opinion, what loss will the entire system of the company suffer by reason of having severed from it this plant from its market for 1,000 kilowatts? * * * A. The answer to that question is, I take it, in dollars?

"Q. No, what would be the effect upon the whole system of the company including its general system? A. Well, the effect in the first place is that we would lose the profits from that business. We are in business to make money. We have a market in Puyallup for the next 25 years by contract with the city. The removal of that market from our system removes the profits for the next 25 years."

Appellee moved to strike out this answer on the ground that loss of profits was not an element of the matter, and the motion was granted and exception taken. The court, in its ruling, made the following statement:

"The Court. It is the duty of the court to keep the issues submitted to the jury as simple as possible. Now, the witness has said that they have got a contract with the city for 25 years and that by this proceeding you are going to lose that profit. Well, the court does not care to enter into a thesis with the jury as to that contract which the company may have with the city being at all times subject to a condemnation proceeding. The matter for the jury to consider is the physical value of the property taken and the use that is being made of that property by the company in its business. The profits they are making is something bearing on that value, but it is not necessary to wholly protect you in the full and fair value of your property that the witness stress this loss. What the city is taking is your property and the value of that property is to be determined among other things by the use you are making of it, and the profitable use you are making of it."

In commenting upon this ruling, appellants in their brief say: "The evidence which was stricken shows that the value added to the Puyallup properties, because they constituted an established and profitable enterprise, was $74,192 and that appellants were prevented from making any proof of this value either under the head of 'franchise value' or under the head of 'severance damage.' There can be no doubt but that this was a reasonable additional value to place on the Puyallup properties which were to be taken."

In considering the propriety of the ruling of the court, it should be stated that the witness had testified to the market value of the property taken, and had arrived at that value by multiplying the gross earnings by four or the net earnings by eleven. The value arrived at by the first method was $444,000 and by the second $450,000. He testified: "Having obtained all these reports and studies by experts as to the values of the property, the cost of reproduction, less depreciation, the statement of what the property is doing in the way of gross earnings, what its operating expenses are, what the net earnings are and what the future prospects are, there are several yardsticks available to measure your market value. In case of electric light and power properties the yardstick usually used is not less than four times the gross earnings and not less than ten or eleven times the net earnings. By net earnings I mean the difference between the gross earnings and the operating expenses and taxes.

By operating expenses I mean the cost of power."

In view of the fact that the witness testified fully as to the capitalization of the profits derived from Puyallup system, it was not proper for him to again capitalize the same earning capacity under the name of "severance damages." It should be borne in mind that the question involved is the market value of the property taken, including as it necessarily would the franchise under which the company is operating.

The witnesses on both sides were fully advised by their experience and by the rulings of the court that they were permitted to take into consideration the earning capacity of appellants' property in determining its market value; that this earning capacity was something in addition to the value of the tangible property sought to be taken.

It must have been clear to the witnesses who testified as to the market value of the property sought to be condemned that the taking over of this property by the city would necessarily appropriate the franchise, and that the right of the appellant to operate as a going concern was entirely dependent upon the franchise, and they evidently considered that fact in fixing the market value. We may assume that there is a difference between going concern value, as it is arrived at in rate-making cases, and the market value of a franchise to be fixed in the condemnation proceedings. A condemnation case necessarily involves ascertainment of the market value of the right of the public utility to continue to operate as such and to derive such future income therefrom as is foreshadowed by the fact that it is operating the property as a going concern, and has a large number of present, and a larger number of prospective, customers, by whatever name we may call that right. A critical analysis of the distinction between the franchise value and going concern value as presented in the two types of cases is entirely unnecessary in the case at bar. The witnesses were allowed to express their opinions fully and completely as to the market value of the property and also as to the separate items of value usually considered in a rate-making case for the purpose of determining a fair value of the property, and we are only concerned in this case by the foregoing rulings of the court excepted to by the appellants, which rulings, as we have held, were a proper exercise of the discretion of the trial judge in the conduct of the trial by the elimination of misleading testimony which might distract the

attention of the jury from the fundamental questions involved; namely, the ascertainment of the market value of the property taken plus the depreciation of the market value of the property retained.

It would perhaps have been better for the parties, after qualifying their witnesses, to have merely asked the basic questions, "What is the market value of the property taken?" and "What is the depreciation of the market value of the property retained by reason of its severance from the property taken?" giving the witnesses full opportunity to explain the basis of their valuation. In such case no doubt the same questions would come up on direct and cross examination, for, if it appeared either on direct or cross examination that the witness had pursued a wholly unwarranted course in arriving at his estimate of value, it would be necessary to make correction thereof either by striking out his estimate of the market value or by instructing the jury to disregard that portion of the value due to the erroneous method.

■ Appellants' next point is as follows: "Appellee's attorneys had no right to eliminate from the proceedings certain items of property which were included in and covered by the language of the city ordinance authorizing condemnation."

The language of the ordinance was very general in its terms, and the description therein does not specifically indicate the items to be taken. That portion of the ordinance was as follows: "The existing works, plants and facilities of the Puget Sound Power & Light Company, a corporation, in the city of Puyallup, for the distribution of electricity within such city, together with the right to sever the same from the remaining works, plants and facilities of said Puget Sound Power & Light Company. Such plants and facilities to be so acquired, consist of a substation, transformers, switches, motors, meters, machinery and equipment, distribution lines, poles, wires, lamps and all appurtenances and accessories, and all contracts, franchises, rights and privileges necessary and convenient for the distribution of such electricity or relating thereto."

The itemizing of the property was accomplished by a detailed statement furnished by the appellee to the appellants.

The specific ruling assigned as error is the sustaining by the trial court of an objection by the appellee to proof of the value of certain transformers temporarily installed at the fair grounds within the city for use during the fair. It is stated in the objection that these transformers were used only once a year, being moved in and out during the week of the fair (in September) under arrangements between the fair association and the company, "and we filed a disclaimer of any intention to take them. They are used probably a week or two or ten days by the fair association, and by the company the rest of the year elsewhere." Objection to this evidence was sustained, whereupon appellants offered to show that the transformers were necessary for the transaction of the business of the company during the fair week, and objection to this offer was also sustained. The trial court was justified under the evidence in concluding that these transformers did not come within the terms of the ordinance which applied to existing works and facilities in the city. The ordinance directing the institution of condemnation proceedings was passed July 3, 1929. The election authorizing the condemnation and approving a bond issue therefor was held March 12, 1929.

■ Later, appellants offered to prove the value of certain materials stored in the substation at Puyallup for replacement purposes which were there prior to December 31, 1929, necessary for the operation and maintenance of the system worth $7,009.88. The argument advanced in the brief in support of the contention of the appellants is that neither court nor counsel had a right to interpret "the ordinance as excluding the foregoing item." It was of course the duty of the trial court to interpret the ordinance, and its ruling to the effect that this property did not come within the description contained in the ordinance was proper. Certainly appellants cannot complain that their property was not taken from them by condemnation proceedings where they were awarded any damages resulting to the property not taken because of its severance from that which was taken.

■ The third point presented by appellants is as follows: "Though the city ordinance under which the condemnation proceedings were instituted specifically provided to the contrary, the appellee city was allowed to introduce evidence that it might continue to take power from Puget Sound Power & Light Company."

The provision of the ordinance referred to is that for the construction of a transmission line to connect the distributing system to be condemned with the generating plants

696

operated by the city of Tacoma. The question arose during the trial in this way: Mr. Towne, a witness called on behalf of the city, had given his opinion as to the severance damage suffered by the appellants as $14,-952. Included in this total he specified several items, among others, the removal of an electric sign, $575; the cost of adjusting street lights at Sumner, $1,350; cost of making severance changes in the system north of Puyallup, $3,018; cost of salvaging the severed thirteen K-V line from north of Puyallup to the Puyallup city limits, $650; to make necessary changes to take care of the district south of the city of Puyallup, $3,-740; cost of adjustment necessary to take care of the territory east of the city of Puyallup, $1,610; cost of work necessary to dismantle transformers in the existing substation, together with incidental damages and costs, $3,242; cost of salvaging the tap in the main transmission line to the substation, $567. On cross-examination he gave the items in a somewhat different form. The cost of one transformer at North Puyallup, $2,018; moving electric sign, installing outdoor street light regulators in Sumner, $1,-350; transformers, etc., on the south and west, $3,750; on the east, $1,510; salvage value of K-V line from the city limits to North Puyallup, $650; removal and warehousing of materials on hand at the warehouse, $650; dismantling, packing, and moving large transformers and oil switch, $3,-242; salvaging of the 55 K-V tap for the main transmission line, $567. He had also stated in estimating the damages to the company by reason of the taking away of the Puyallup property and considering the amount of damage by reason of the severance or by reason of the fact that the company would lose so much business:

"It is my opinion that the amount of the damage is negligible, for the reason that in my opinion the city of Puyallup would go to the Puget Sound Power & Light Company for power in the event it takes over the distribution system. The Puget Sound Company is the logical company for supplying the city of Puyallup. In the event that the city of Puyallup did not buy from the Puget Sound Company then it is my opinion that the damages still would be negligible 'by reason of its proportion to the rest of the system.' In the event it is shown that the company is going to absolutely lose this business and be prohibited from the sale of wholesale power to the city of Puyallup, thereby suffering a loss, and providing this loss is a loss that is

guaranteed and perpetuated, it is my opinion that the company should be paid for it, but otherwise that it should not be paid.

"In the allowance made by me for the severance damage I did not allow any amount of money whatever based upon the earnings of the company."

On redirect examination appellee asked this witness: "Now, Mr. Towne, getting back to this severance again, as to whether or not the earnings of the company,—the remaining property after the severance, I will ask you whether or not you considered the probability of the company keeping on selling to Puyallup in arriving at whether or not there would be any severance loss to the company by reason of loss of business?"

This was objected to on the ground it was irrelevant, incompetent, and immaterial and not proper in this case. The objection was overruled. Inasmuch as this evidence had already been adduced without objection, appellants cannot take advantage of this ruling.

The ruling of the court on this subject was again invoked by motion to strike out testimony already adduced upon this subject. The motion, however, did not specifically indicate the questions and answers to be stricken out; moreover, as we have already pointed out, some of this evidence was introduced without objection. The motion was in part as follows: "If the Court please, before we proceed with our case, I would like to move the court to strike out all evidence given by the petitioner's witnesses to all of which we objected, to the effect that the city of Puyallup might buy its power from the Puget Sound Power & Light Company at the substation in Puyallup, for the reason that under the ordinance just introduced in evidence which set forth the plan, part of that plan is that the transmission line be built into the city of Tacoma, they are to buy power either from the city of Tacoma, or from some other person, and the plan cannot be deviated from."

The motion was properly denied, for the reason that it was too general. Moreover, the probability or possibility that the city might buy its power from the Puget Sound Power & Light Company was a proper element to consider in determining loss suffered by the severance, if in the opinion of the witness it affected the market value of the remaining property. The court, in allowing an exception to this ruling, stated as follows:

"The Court. Exception allowed. The jury will understand that you are not to spec-

ulate. The only bearing that the court can see that evidence has, although you are instructed you are the sole and exclusive judges of the weight of the evidence, is that the city would be, if it acquires this property, a potential customer of this company. It amounts to showing you that the city is not tied up in any way to keep it from being a customer; that it would be in the market to purchase power such as the company furnishes. I see no other bearing it has in the case.

"Mr. Todd. May we have our exception to the remark of the Court.

"The Court. Considering your exception too general, it is disallowed."

Thereupon counsel specified the same grounds of exception stated in the motion to strike out the testimony.

The court, in its final instructions to the jury upon this subject, stated: "You are not to take into consideration in arriving at your verdict, as a reason to lessen the owner's compensation for property taken, the fact that the city of Puyallup, after it acquires the electrical distribution system of the defendant Puyallup, may purchase from the defendant electrical current for such distribution system."

No exception was taken to this instruction, and it was more favorable to the appellants than they were entitled to. As we have stated, in severance damages an element to be considered is the depreciation of the market value of the balance of the plant by reason of the severance of the unit taken. A purchaser of such a plant would undoubtedly take into consideration the fact that there would be an opportunity to sell power to the city of Puyallup. This would be true regardless of the legal obstacles which might be interposed at the outset to the purchase of such power under then existing conditions. In other words, the question is, What would the purchaser and seller consider in fixing the market price of the property? The rule invoked by appellants in support of their position is thus stated in its brief: "The rule in eminent domain cases is that the damages cannot be reduced or mitigated by any consideration of future advantage to the owner which the condemnor is not under any obligation to concede; and evidence based on such claimed advantage is inadmissible. See: 20 C. J. pp. 766 et seq., § 1161." This rule has no application to the situation involved here.

Appellants' next point is thus stated: "The trial court erred in allowing testimony that appellants would suffer no substantial severance damage because, by the growth of new business on other plants, appellants would soon make up the loss, and in denying appellants the right to cross-examine a witness who had so testified."

Appellee's witness, Homer Blair, testified with reference to severance damage as follows: "I figure the severance damages to be the cost of making the necessary changes. The total cost in my opinion would be $13,-525.05."

He explained the proposed changes, and stated in response to a question that this constituted all the severance damages that he had allowed in his estimate. He further testified:

"I took into consideration on the question of severance damage the possibilities of idle generating capacity being created by the taking of the Puyallup system. I did not make any allowance of damage on that account for the reason that the load into Puyallup is so small compared with the entire system that it would be just a few days before they would catch up. The load at Puyallup is really about one per cent of the company's entire load. Considering the normal increase of the load on the system of the Puget Sound Power & Light Company only about three weeks time would be required to make up the loss of the load in Puyallup. The average idle period of generating capacity, therefore, in my opinion would be about ten days. * * *

"I did not allow any damages for any possible loss of profits that the company might suffer in the operation of the balance of its system after the Puyallup system was taken. In my opinion there is no such damage. There will not result any loss of usefulness or any idle capacity upon the 55,000 K.C. transmission line to Puyallup. The expense of serving territory outside of Puyallup will not be increased after the severance over what it is in the present system."

It will be observed that the witness is giving the basis upon which he arrived at his severance damage. It is certainly proper for him to explain, not only that he considered certain elements as making up the total of such damage, but that he omitted therefrom the damage to the business of the appellants due to the severance of the property taken, because in his opinion there was no such damage. The rulings of the trial court in permitting this testimony are proper.

Appellants also claim that they were not permitted to cross-examine the appellee's witness Glenn Smith upon the amount of severance damages. The question propounded on cross-examination, to which objection was sustained, is as follows: "But they have lost apparently a thousand kilowatts, haven't they?" This was objected to on the ground that it was immaterial, and objection sustained. It is not altogether clear what was intended by the question, and there was no error in the ruling, particularly in view of the fact that the witness had stated on direct examination the fact that the question was calculated to draw out as follows: "You are taking away about 1,000 kilowatts of the company's load. That is in the neighborhood of one-half of one per cent of their peak system load at the present time. They are going at 34,000 kilowatts in addition to their peak according to the report filed at Olympia that I checked, so that 1,000 kilowatts represents about two weeks normal increase in their system load. That is, it would be so short a time before the load now in Puyallup would be made up by natural increase that it is hardly worth considering. The question of idle capacity brings into it the fact that last year on the peak, which is the time when the capacity is needed, they did not have enough capacity to continue to serve all their customers. The normal growth would take care of the entire load in Puyallup that they are losing in two weeks. There would be an average of one week's loss, assuming that the City of Puyallup did not buy their energy to operate the distribution system when they take it over."

It was a conceded fact in the case that the city of Puyallup was using about 1,000 kilowatts of electrical energy, so that there is no point to the particular question for the court to rule upon.

The court instructed the jury, among other things:

"Not only in assessing the value of the property actually taken but also in assessing the damages to the property not taken you will be guided by the actual full fair cash market value of the property taken and the decrease or diminution of the actual fair cash market value—correct that last to read 'full fair cash market value' of the property not taken by reason of the taking of only a part of the property operated as one system, for that is the proper measure of damages and compensation to be awarded by you.

"If you find from the evidence in this case that by reason of the taking of the property involved in this proceeding from its entire electric system the remaining parts of the defendant's system will suffer any loss or damage, then you shall also include in your award such sum as will adequately compensate the owner for such loss or damage.

\* \* \* \* \* \*

"The commencement of this condemnation proceeding by the city did not deprive the company of its right to continue to make additions and betterments to its property. At any time until the city has paid the just compensation to be determined by you and procured the entry of a decree of appropriation, the city can abandon this proceeding.

"You are instructed, therefore, that the defendant had a right in its discretion to make any additions and betterments to its plant and system during the pendency of these proceedings, and it is your duty to include in your verdict an allowance for the fair and reasonable cash market value of all such additions and betterments as are shown by the evidence to have been made.

"That instruction will be to a degree qualified by a later instruction.

\* \* \* \* \*

"You are instructed that it is the law in this jurisdiction and it is the duty of the owner in an action of this kind to refrain from unnecessarily aggravating the damages which may result to their property not taken, and if you find in this case that the defendants have unnecessarily augmented or increased the damages which they will sustain by reason of the taking of the substation and distribution system in the city of Puyallup, then you are to award them nothing for such augmented or increased damages. That is, to the extent that they are unreasonably and unnecessarily increased.

"The fact that the city brought this suit did not require the owner to cease making additions and repairs and if it did so in good faith, adding only what it considered necessary and prudent in the management of its property and business, you are not to withhold from them their value, but if the owner grossly and extravagantly overbuilt the property it has no right to recover the cost of such gross and extensive overbuilding because it would not correspondingly increase the market value."

The appellants excepted to the instruction in regard to the aggravation of damages, and contend on appeal that there was no evidence to which such an instruction was

properly applicable, and upon that basis claims that the giving of the instruction was erroneous. It appears from the evidence in this case that, after the city had voted a $250,000 bond issue to acquire this property in March, 1929, the appellants began a construction program in Puyallup of approximately $100,000. One of these items of new construction was an office building costing $28,000 which had not been contemplated by nor included in the appellants' annual budget, but the construction was moved forward by emergency methods, so that at the time of the trial the building had been completed. The appellee disclaimed any intention of taking this building, but the question remained as to whether the taking of the appellants' distributing system would depreciate the value of the building. It also appeared that some of the additions to the distributing system were constructed at a cost of money and material in excess of the market value of the result achieved, and some portions were unnecessary. The court having instructed the jury to allow to the appellants the market value of the property taken and the decrease, if any, in the market value of the property not taken, its instructions with reference to the aggravation of damages can only be considered as a caution to the jury to refrain from allowing damages by reason of over expenditures where such overexpenditures did not affect the market value of the property taken or remaining. This was proper.

The case was fully and fairly tried, both court and counsel gave careful consideration to the various questions of law and evidence presented, and the jury was fully advised by the testimony and instructions as to the question submitted for its decision, and the verdict was well within the estimates of value submitted to them.

Judgment affirmed.