[Civ. No. 14040. Fourth Dist., Div. One. Sept. 15, 1976.]

SOUTH BAY IRRIGATION DISTRICT, Plaintiff and Appellant, v.
CALIFORNIA-AMERICAN WATER COMPANY;
Defendant and Appellant;
CITY OF NATIONAL CITY, Intervener and Appellant.

948

952

954

## COUNSEL

Jennings, Engstrand & Henrikson, Paul D. Engstrand, John H. Whitney and Ronald L. Endeman for Plaintiff and Appellant.

Gray, Cary, Ames & Frye, Eugene L. Freeland, David E. Monahan, Michael J. Myers and Richard A. Paul for Defendant and Appellant.

Hill, Farrer & Burrill, William M. Bitting, David C. Grant, Richard A. Clarke, Robert L. Harris, James A. Kaylor, Heller, Ehrman, White & McAuliffe, Weyman I. Lundquist, J. C. Bensick, Andrew M. Colvin, Rollin E. Woodbury, John R. Bury, Tom P. Gilfoy and Jerry A. Brody as Amici Curiae on behalf of Defendant and Appellant.

Donald F. McLean, Jr., City Attorney, for Intervener and Appellant.

## OPINION

COUGHLIN, J.*—In this eminent domain action defendant, California-American Water Company, hereinafter referred to as The Company, appeals from an interlocutory judgment condemning its water works identified as the Sweetwater District of The Company's San Diego division, hereinafter referred to as The Sweetwater System, and awarding compensation therefor in the sum of $14,485,000, with costs of suit in the additional sum of $17,295.97, subject to The Company's right to a supplemental trial to determine the amount of compensation to be awarded for designated additional items. The overriding issue on appeal is whether the amount of the award is proper under the evidence and the law in the case.

Plaintiff, South Bay Irrigation District, hereinafter referred to as The Irrigation District, by an amended complaint, and intervener, the City of National City, hereinafter referred to as The City, by a complaint in intervention, pursuant to a joint powers agreement between The Irrigation District and The City, sought acquisition of The Sweetwater System, in its entirety, for the purpose of establishing an integrated, publicly owned water works system.

The Company appeals from the whole judgment. The Irrigation District and The City cross-appeal, with the proviso each of their appeals "is hereby abandoned" if the appellate court should decide to correct any error they assert by a reversal for a new trial instead of by a modification of the judgment.

The action was initiated by a complaint filed May 10, 1968. Trial commenced on November 1, 1971, before the court without a jury, and concluded with a final argument on August 10, 1972. The issue for determination at the trial was the amount of just compensation to be awarded for the taking, which was raised by The Company's answers alleging "the fair market value of the properties and rights the Plaintiff seeks to condemn herein is approximately $50,000,000," and "the damage" to other property of The Company "not being condemned by the Plaintiff by reason of its severance is approximately $5,000,000." Written findings of fact and conclusions of law and the interlocutory judgment were filed, following the filing of a written

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

memorandum opinion by the trial judge, proposed findings, and a request for special findings which was denied. The Company moved for a new trial, which was denied, and on May 14, 1973 filed its notice of appeal.

The Sweetwater System, which was initiated in 1869, presently serves an area of 33 square miles, including the City of National City, the City of Chula Vista and contiguous unincorporated territory; serves an average of 14.5 million gallons of water per day to 135,000 persons: impounds and distributes water obtained from the Sweetwater River watershed by means of two large dams, i.e., the Sweetwater reservoir and the Loveland reservoir, also water obtained from wells in the City of National City and water imported from the Colorado River through purchase from the Metropolitan Water District of Southern California; includes a water treatment plant, 21 system reservoirs and tanks, 20 distribution system pumping plants, 318 miles of distribution mains, over 25,000 service connections, and more than 1,200 fire hydrants; and also includes other miscellaneous appurtenant facilities. During the period 1950-1969, Colorado River water comprised 70 percent of the water distributed.

■ Property owned by a public utility water company is impressed with a public use; may be transferred only with the consent of the Public Utilities Commission; may be used only for the purposes to which dedicated unless otherwise authorized by the commission; and is subject to regulation respecting the rate of return thereon as an investment and the rates charged for its services (Cal. Const., art. XII, §§ 3, 6, 9; Pub. Util. Code §§ 216, subds. (a), (b), 451, 454, 456, 851, 2701; *Pacific Tel. & Tel. Co.* v. *Public Util. Com.,* 62 Cal.2d 634, 645 [44 Cal.Rptr. 1, 401 P.2d 353]; *Southern Calif. Edison Co.* v. *Railroad Com.,* 6 Cal.2d 737, 754 [59 P.2d 808]). In determining such rates the commission is not bound to use any particular formula or mathematical process (gen., see *Power Comm'n* v. *Hope Gas Co.,* 320 U.S. 591, 602 [88 L.Ed. 333, 344-345, 64 S.Ct. 281, 287]). Historically the profit allowed such a company on its investment is fixed at a percentage of a factor known as the rate base, which, for rate-fixing purposes, equates the investment. It is the value of the property devoted to public use (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 644). Investment items or assets included in the rate base are those fixed by rule of the commission; in general consist of properties constituting the utility plant plus an allowance for working capital, materials and supplies, less designated exclusions and

adjustments, e.g., property or portions thereof which are unproductive for public utility purposes (see *ibid.*, pp. 663, 667); do not include all of the company's property or property rights, e.g., contributions in aid of construction, advances for construction and other items hereinafter considered; and are given a money value pursuant to a designated formula. In recent years the value of the items in the rate base has been premised on their original cost less depreciation based on the straight-line remaining-life method (gen., see *ibid.*, pp. 644, 665).

On May 30, 1965, American Water Works Company bid the sum of $41 million for the Sweetwater and five other water systems then owned by the California Water and Telephone Company; and on December 16, 1965, its wholly owned subsidiary, The Company, through an agreement of transfer and sale, and with subsequent approval by the Public Utilities Commission, became the owner and operator of the six separate water systems for the purchase price of $41,290,517.56, which included the payment of $41,281,361.08 in cash and the assumption of customer deposits in the sum of $9,156.48. The total utility plant rate base involved in the acquisition was $29,120,050.45. The purchase price exceeded the rate base by $12,170,467.11. There is evidence the bid of the parent company in excess of rate base was prompted by its ambition to expand its operation into California. One of the water systems included in the purchase was known as the Coronado District, and it with The Sweetwater District comprised the San Diego division of The Company's water systems.

In 1970 the Great Lakes Carbon Corporation sold the Palos Verdes Water Company to California Water Service Company for $8,839,564, which was 2.3 percent more than the utility plant rate base. Evidence of the latter sale was admitted under the concept it furnished comparative market data.

The parties stipulated, in determining the issue of just compensation for the property taken, the inventory date would be April 1, 1969, and the valuation date would be August 15, 1969.

The books of The Company showed the depreciated original cost of the items included in the rate base on April 1, 1969, i.e., the date of

inventory, was $10,428,065.97, and on December 31, 1969, was $10,598,036.95.[1]

At the trial The Company contended just compensation for the taking, exclusive of severance damage, should be between $38,570,956 and $50 million; and introduced the opinion testimony of two valuation experts, i.e., J. J. Barr, its president, and John Housiaux, purportedly supporting this contention. On the other hand, The Irrigation District[2] contended just compensation should not exceed $11.3 million, and in support of this contention introduced the opinion testimony of four such experts, i.e., Max Bookman, Harold Heidrick, Jerome Katzin and Edward Neuner, whose valuations ranged from $9.6 million to $11.3 million.

The Company's experts, in reaching their opinions, relied upon the appraisal method known as the reproduction, replacement or reconstruction-cost-new-less-observed-depreciation approach to determine the value of the utility plant improvements, and added the market value of the land in its natural state, the value of The Company's books, records and documents, the value of its franchises and consents, the value attributable to organizational costs, i.e., costs incident to acquiring the land, constructing the improvements thereon and commencing the utility business,[3] the value of the utility as a going concern, and the costs incurred in presenting The Company's case in the eminent domain action as an item a willing buyer and seller would consider in reaching an agreement as to price for the condemned property.

On the other hand, The Irrigation District's experts, except Katzin, in reaching their opinions, relied primarily upon the appraisal method

[1]These 1969 rate bases reflect a deduction of $824,377, equating an adjustment of rate base because of the Public Utilities Commission's decision a portion of the Loveland reservoir investment had no earning power and; for this reason, reduced the rate of return on rate base .5 percent, i.e., from 6.5 percent to 6 percent; and also reflect additional deductions of $33,480.27 and $38,167.77 for the periods ending April 1 and December 31, respectively, on account of "transportation equipment (depreciated)."

At oral argument we were furnished a copy of an order by the commission dated April 16, 1974, which was four years and eight months after the valuation date, approving a higher rate base premised on the test year 1973 which included the Loveland reservoir at its full rate base value.

[2]Reference herein to actions, trial conduct and contentions of The Irrigation District include The City unless the context thereof indicates the contrary.

[3]The organizational costs did not include the price paid for the land acquired, or costs of actual construction.

known as the capitalization-of-income approach, premising such on the rate base which, under their testimony, varied between $10,918,000 and $10,428,000. Katzin used the capitalization-of-income approach but premised his conclusions on factors other than rate base.

There was expert testimony supporting the conclusion that of the $41,290,517.56 paid for the six utility water companies acquired by The Company in 1966, $14,865,000 thereof properly was allocable to The Sweetwater System and that $3,840,000 of this amount was allocable to the excess of the price paid over rate base.

In approving The Company's 1966 purchase of the six utilities, the Public Utilities Commission referred to the excess in purchase price over rate base as an acquisition adjustment[4] and declared it was essential there be no misunderstanding of its policy respecting the treatment of any such excess in a rate proceeding, which was to "fix rates on the basis of an original rate base and that the plant acquisition adjustment is not included as an element of such rate base."

There is evidence supporting the conclusion the profit or rate of return allowed by the commission on The Company's investment in The Sweetwater System in 1969 was 7 percent of rate base.[5] The Company's annual reports to the Public Utilities Commission and the testimony of Mr. Barr show its annual net revenue for the years 1965 through 1969 averaged $1,022,800.

In his memorandum decision, the trial judge set forth a detailed summary and analysis of the evidence in the case on the issue of value, including the testimony and opinions of each of the valuation experts and other witnesses; expressed his views respecting the applicability and acceptability of this testimony in determining the issue of just compensation; reviewed the evidence respecting the 1966 sale of the six water utility systems to The Company and the 1970 sale of the Palos Verdes water system to the California Water Service Company and, noting the decision of the Public Utilities Commission approving the former, emphasized its policy foreclosing consideration of the excess of sale price over rate base in fixing rates the purchaser might charge for its services;

---

[4]Some decisions have referred to the excess of sale price or value of a public utility over rate base or capitalized value as a premium.

[5]There also was evidence supporting a conclusion the profit or rate of return on investment in 1969 was 7.08 percent of the rate base.

declared "the issue that towers above all others, and which resulted in the immensity of the differences in valuation, is the basic one of valuation theory"; discussed the law applicable to the case; outlined and considered the contentions urged by each of the parties; referred to decisions stating the general test for determining just compensation is the loss suffered by the owner, the detriment he sustains, the exchange value of what is taken from him;[6] expressed the conviction just compensation for taking an operating and revenue-producing public utility as an entire unit, as in the case at bench, is the fair market value of the utility determined pursuant to the measure prescribed by the rule in *Sacramento etc. R.R. Co.* v. *Heilbron*, 156 Cal. 408, 409 [104 P. 979], i.e., the highest price the property would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all the uses and purposes to which it was adapted and for which it was capable; concluded "fair market value is the appropriate measure of just compensation for the taking of an investor-owned utility by eminent domain, . . . the fact regulation of earnings must be considered in the ascertainment of fair market value, . . . the traditional appraisal concepts of market data, capitalization of earnings, and replacement or reproduction cost new less depreciation, are all entitled to consideration by the finder of fact, [and] the respective weight to be assigned each approach depends upon the case under consideration"; rejected the valuation opinion of Mr. Barr because of his reliance on the formula of reconstruction-cost-new-less depreciation, plus land, land rights and going-concern value as the determinative factor of value in the case rather than one of the factors a knowledgeable, willing buyer and seller would consider; set forth in detail his reasons for such rejection; stated " . . . by no stretch of the imagination can current duplication costs be said to represent or come any where near market value in the present case. Nor can it represent legitimate indemnity or compensation to the owner for loss of services. There is no possibility of a sale as of the date of value or today or in the foreseeable future at that figure," i.e., Mr. Barr's valuation figure; also concluded "where reconstruction cost substantially exceeds a figure which earnings will support, it should be given little weight in determining market value."; rejected the contention the use, in an eminent domain action, of the capitalized-income approach in determining the market value of a public utility whose earnings are controlled by the government does not deny the utility the just compensation guaranteed by the Constitution; stated his conclusion

---

[6]The Supreme Court has referred to this concept as one which makes up in idealism what it lacks in universal application (*Community Redevelopment Agency* v. *Abrams*, 15 Cal.3d 813, 827, fn. 9 [126 Cal.Rptr. 473, 543 P.2d 905]).

"the most accurate indication of market value in this case is to be determined from the capitalized earnings" with "legitimate assistance . . . from such evidence of market data as may exist"; made it clear the capitalized-income or market-data approach was not conclusive, but would produce factors the knowledgeable buyer and seller would consider in agreeing upon the price to be paid for the property taken, by expressly stating: "I may not assume, however, that a hypothetical buyer and seller would agree upon a figure necessarily the equivalent of capitalized earnings."; argumentatively rejected the contention of The Irrigation District, premised on its interpretation of Evidence Code section 822 subdivision (a), that public agencies are excluded from consideration as prospective buyers or sellers in applying the *Heilbron* rule (*Sacramento etc. R.R. Co.* v. *Heilbron, supra,* 156 Cal. 408), upon the ground such an interpretation would change applicable provisions of substantive law and is contrary to the legislative intent expressed in Evidence Code section 821; referred to the 1966 sale of The Sweetwater System to The Company, and stated although valuation witnesses on each side rejected this sale as relevant evidence, he believed it was relevant, was "concrete evidence, not only that informed purchasers will pay a premium over rate base or capitalized earnings for utility property in general, but for the very property in question" and "the valuation testimony of all of plaintiff's witnesses loses some credibility because of their failure to accord more weight to the 1966 sale"; considered the question respecting the probability of an increase in the rate of return allowed by the commission relative to The Sweetwater System, and expressed the belief "the evidence would support a probable allowance of 7.8 percent as a rate of return," the rate of return used by the plaintiff's valuation witnesses, with the exception of Mr. Katzin, was less than this figure, and these witnesses did not consider the impact of a probable rate increase on the price a knowledgeable buyer might pay for the system; referred to testimony by the witness Barr regarding the feasibility of withdrawing Sweetwater reservoir from the utility plant and devoting it to residential purposes, and concluded "an informed purchaser could well give it some consideration"; dealt with the subject of "going concern" which he considered a controversial concept, related the views expressed in texts and decisions on the subject, briefly summarized the testimony of the witness Housiaux respecting it, noted The Irrigation District's witnesses did not consider it "an item that properly should be segregated and assigned a separate value inasmuch as their approach was one in which the willing buyer would be purchasing the entity based on its income potential" and concluded, to the extent a willing buyer and

seller would be influenced in their determination of price by the additional value of a viable operating utility contrasted with the value of mere land plus a physical plant, going concern is an element of just compensation but separate treatment thereof is not required except as part of a reconstruction cost study; considered the issue of severance damages; summarized his "final approach to just compensation" which showed his determination thereof was premised on market value under the rule in *Heilbron* (*Sacramento etc. R.R. Co.* v. *Heilbron, supra,* 156 Cal. 408), and in determining the market value of The Sweetwater System pursuant to that rule he considered many factors which, under the evidence, would be considered by a hypothetical knowledgeable buyer and seller in agreeing upon a price to be paid therefor in a hypothetical open market;[7] declared his "final conclusions of just compensation are judgment decisions based upon the considerations I have endeavored to outline in the foregoing discussion"; and stated his "findings and decision" as follows:

"1. Just compensation to be paid to defendant for the taking of the lands, properties and rights of the Sweetwater District, but without

---

[7]The verbatim summarization by the court is: "I adopt fair market value as the proper criterion. Any form of present day duplication cost is not a valid indication of fair market value in this case. (However, it might be of some significance in influencing a buyer to pay a premium as will be mentioned *infra.*) A combination of factors, viz., the long period over which the utility has been developed, the inflationary spiral, and the fact that California is an original cost rate base state, has created a vast spread between historical cost less depreciation and reproduction cost new less depreciation. As a result, it would be utterly inconceivable that the latter would form the basis of a negotiated market price where the Commission bases its rates on historical costs. In my opinion there is no reasonable probability of a change in the Commission's preference in the near future.

"I consider that the approach of the plaintiffs' valuation witnesses was generally sound to the extent that they considered income the primary indicator of value. I believe they did not give sufficient weight to the 1966 sale, both as a 'comparable sale' per se and as an indication that informed private investors will, at least on occasion, pay a substantial premium over rate base or capitalized income.

"I consider it reasonable to conclude that sophisticated experts in the waterworks field will consider paying a premium where present day asset value in the sense of duplication cost substantially exceeds book value, and where the percentage of land and land rights to overall value is unusually high. I consider Mr. Barr's testimony in that regard to be logical and realistic. I also believe that in negotiating a purchase price, consideration would be given to the potential of developing substantial industrial acreage that is available in the service area.

"On the other side of the ledger, the operation of the [Company] during the period pertinent to our valuation was not without problems. It had to pay interest rates in funding its debt substantially higher than anticipated when the 1966 acquisition was made. This was detrimental to equity value. It was also faced with inability to reduce expenses and thus increase the operating revenues due to inflation. No relief on the acquisition adjustment was or is in sight. These factors would also be subjects for the consideration of willing buyers and willing sellers."

consideration of the lost unbilled revenues and customer accounts receivable, and not including severance damage, is the sum of $14,250,000.

"2. Just compensation to be paid to defendant for the loss of unbilled revenues and customer accounts receivable is $60,000.

"3. Just compensation to be paid as severance damage to the remaining ownership, specifically in its Coronado District, is the sum of $175,000.

"4. Total just compensation to be paid to defendant is the sum of $14,485,000."

■ On appeal the memorandum decision of a trial judge stating the reasons and furnishing the bases for his decision, as in the case at bench, should be given special consideration for the purpose of determining whether the process used in reaching his conclusions on the issue of just compensation conformed to the measure prescribed by law (*Consolidated Rock Products Co.* v. *City of Los Angeles,* 57 Cal.2d 515, 532 [20 Cal.Rptr. 638, 370 P.2d 342]; *Union Sugar Co.* v. *Hollister Estate Co.,* 3 Cal.2d 740, 750-751 [47 P.2d 273]; *Coakley* v. *Ajuria,* 209 Cal. 745, 749 [290 P. 33]; *Winegar* v. *Gray,* 204 Cal.App.2d 303, 312 [22 Cal.Rptr. 301]; see also *1st Olympic Corp.* v. *Hawryluk,* 185 Cal.App.2d 832, 838 [8 Cal.Rptr. 728]).

### THE COMPANY'S APPEAL

The Company contends[8] the reconstruction-cost-new-less-observed-depreciation formula should be the method used to determine the value of its property and just compensation for the taking or, in any event, should be given major consideration in making such determination, and the court erred in giving it little or no weight; in giving major consideration to capitalization of earnings as a determinative factor; in applying the *Heilbron* market value rule in an eminent domain action condemning a public utility because the "enterprise" taken is special use property possessing going concern value and intangible assets; in failing to include as earnings the probable income

---

[8]The Company's contentions are and may be stated in various ways.

from the use of part of The Company's property for other than public utility purposes or from sales thereof as surplus property and also failing to include the market value of such property in the light of such uses; in failing to give consideration to and include in its award several intangible assets or items of value, i.e., "going concern," organization and construction costs, the cost of developing its books and records, routes and similar intangibles and the value of its franchises and consents; in failing to include in its award the value of property acquired by contribution; in accepting the testimony of The Irrigation District's witnesses, which is premised on rate base, historical cost or capitalization of earnings, and upon instructions from its counsel which closed the "open market" to public agencies; in overruling The Company's objections to the receipt of (1) evidence of rate base, historical cost, and capitalization of earnings for the purpose of determining just compensation, and (2) evidence of the apportionment of the 1966 sale purchase price in applying the market data approach to valuation; in denying its request for special findings; and in refusing to include as a part of the award an additional sum of $3,500,000 incurred by The Company in preparation and presentation of its case on the issue of just compensation.

As we categorize them generally The Company presents 18 contentions in its briefs and oral argument. We have considered each of them and conclude they do not justify a reversal of the judgment for the reasons hereinafter stated.

■ Preliminarily we note, The Company's arguments in support of many of its contentions implicitly are directed to the weight and interpretation of the evidence, which are not within the scope of appellate review. The trier of fact is the sole arbiter of such matters (*Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 246 [259 P.2d 649]; *Dillard* v. *McKnight,* 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835]); is not required to accept the opinion testimony of any witness as to value (*People* v. *Ocean Shore Railroad,* 32 Cal.2d 406, 427 [196 P.2d 570, 6 A.L.R.2d 1179]); in the exercise of judicial discretion may accept that part of such testimony he concludes worthy of belief and reject that part which is unworthy of belief (*Bechtold* v. *Bishop & Co., Inc.,* 16 Cal.2d 285, 291-292 [105 P.2d 984]; *Cottle* v. *Gibbon,* 200 Cal.App.2d 1, 7 [19 Cal.Rptr. 82]); and, in determining the amount of just compensation in an eminent domain action, is not required to coincide his determination with the specific amount fixed by the valuation testimony of any expert

witness (*City of Los Angeles* v. *Retlaw Enterprises, Inc.*, 16 Cal.3d 473, 491-492 [128 Cal.Rptr. 436, 546 P.2d 1380]; *Joint Highway Dist. No. 9* v. *Railroad Co.*, 128 Cal.App. 743, 762 [18 P.2d 413]).

The Constitution of the United States guarantees payment of "just compensation" to the owner of private property taken for public use (U. S. Const., 5th Amend.); and the Constitution of the State of California guarantees such payment for property "taken or damaged" for public use (Cal. Const., art I, § 19). However, absent specific constitutional or statutory provision to the contrary, judicial decisions applying pertinent interpretive common law principles have held certain items of damage resulting from such taking do not constitute an element of constitutionally required "just compensation" (*Community Redevelopment Agency* v. *Abrams*, 15 Cal.3d 813, 820, 827, 831-832 [126 Cal.Rptr. 473, 543 P.2d 905]; *County of Los Angeles* v. *Ortiz*, 6 Cal.3d 141 [98 Cal.Rptr. 454, 490 P.2d 1142, 68 A.L.R.3d 538]).

Statutory provisions pertinent to the issue of just compensation in the case at bench are set forth in former Code of Civil Procedure sections 1248 and 1249 (see *People* v. *Ocean Shore Railroad, supra,* 32 Cal.2d 406, 425 [196 P.2d 570, 6 A.L.R.2d 1179]), in Evidence Code section 810 et seq., and in Public Utilities Code section 1411. The latter section responds to the enabling provision of former article XII, section 23a of the California Constitution authorizing the Legislature to confer upon the Public Utilities Commission jurisdiction in eminent domain proceedings to acquire the property of a public utility.[9] It should be noted, present provisions of the Code of Civil Procedure governing eminent domain actions, i.e., section 1230.010 et seq., known as the Eminent Domain Law, do not apply to a case in which an appeal is pending on the operative date of those provisions, i.e., July 1, 1976, by virtue of section 1230.065, subdivision (d) thereof, which provides "[T]he law applicable thereto prior to the operative date governs the determination of the appeal . . ." (see *Community Redevelopment Agency* v. *Abrams, supra,* 15 Cal.3d 813, 817); and, for this reason, do not apply to the case at bench.

[9]In *Community Redevelopment Agency* v. *Abrams*, 15 Cal.3d 813, 820-821, footnote 6 [126 Cal.Rptr. 473, 543 P.2d 905], the Supreme Court, addressing its attention to the fact a public utility in an eminent domain proceeding before the Public Utilities Commission is entitled to just compensation for its land, property and *rights*, said: "It is manifest that the measure of compensation vouchsafed a public utility by the Public Utilities Code—i.e. 'just compensation . . . for [its] lands, property, *and rights*'—is also to be accorded it in proceedings under the Code of Civil Procedure."

The term "just compensation," as used in the constitutional provision guaranteeing the payment of such upon the taking of private property for public use is not constitutionally defined; the elements comprising such are not constitutionally identified; and the courts, in the exercise of their power to interpret and enforce constitutional provisions, have been required to provide tests or measures to effect the constitutional purpose. Considering this problem, as it applies to property actually taken, the United States Supreme Court, in *United States* v. *Miller,* 317 U.S. 369, 373-374 [87 L.Ed. 336, 342-343, 63 S.Ct. 276, 280, 147 A.L.R. 55], stated: "It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value,' the 'market value,' and the 'fair market value' of what is taken. The term 'fair' hardly adds anything to the phrase 'market value,' which denotes what 'it fairly may be believed that a purchaser in fair market conditions would have given,' or, more concisely, 'market value fairly determined.' "; also "It is usually said that market value is what a willing buyer would pay in cash to a willing seller."

The California Supreme Court, in the early case of *Spring Valley W.W.* v. *Drinkhouse,* 92 Cal. 528, 533 [28 P. 681], accepted the concept that the market value of property taken for public use equates "just compensation" for the taking as the measure thereof in an eminent domain action; and is determined in view of all of the facts which would naturally affect its value in the minds of sellers and purchasers.[10] In *Sacramento etc. R.R. Co.* v. *Heilbron, supra,* 156 Cal. 408, 409, the court gave definitive meaning to the measure theretofore approved and said: "[T]he rule is of universal acceptance that the measure of this damage is the market value; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable."

The *Heilbron* definition of market value became the basis (1) of a refined and more explicit statement of the definition of that term premised on a consideration of the statement of the general rule in

---

[10]The decision in *Spring Valley W.W.* was overruled on other grounds in *County of Los Angeles* v. *Faus,* 48 Cal.2d 672, 680 [312 P.2d 680].

*Spring Valley W.W.* v. *Drinkhouse, supra,* 92 Cal. 528, 533, which refers to the views of prospective sellers as well as those of prospective purchasers, (2) of decisions declaring each of them, respectively, must be a willing seller and a willing buyer (*Redevelopment Agency* v. *Zwerman,* 240 Cal.App.2d 70, 75 [49 Cal.Rptr. 443]; *People* ex rel. *State Park Com.* v. *Johnson,* 203 Cal.App.2d 712, 721 [22 Cal.Rptr. 149]; *City of Daly City* v. *Smith,* 110 Cal.App.2d 524, 531 [243 P.2d 46]) and (3) of decisions excluding consideration of their views respecting noncompensable items of value. The substance of the definition of market value thus evolved is stated statutorily in former Evidence Code section 814,[11] and Evidence Code section 822, subdivision (e), which provide: "The opinion of a witness as to the value of property is limited to such an opinion as is based on matter . . . which a willing purchaser and a willing seller, dealing with each other in the open market and with a full knowledge of all the uses and purposes for which the property is reasonably adaptable and available, would take into consideration in determining the price at which to purchase and sell the property or property interest being valued . . . , unless a witness is precluded by law from using such matter as a basis for his opinion."; and evidence of the "influence upon the value of the property or property interest being valued of any noncompensable items of value" is not a proper basis for an opinion as to the value of the property (see *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Covich,* 260 Cal.App.2d 663, 665 [67 Cal.Rptr. 280]; *People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc.,* 253 Cal.App.2d 870, 881, fn. 11 [62 Cal.Rptr. 320]).

Market value as thus defined has been accepted and applied by the courts of California as the general rule governing the determination of just compensation in eminent domain actions (*City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 490, fn. 14; *Klopping* v. *City of Whittier,* 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Merced Irrigation Dist.* v. *Woolstenhulme,* 4 Cal.3d 478, 488, 491, 494 [93 Cal.Rptr. 833, 483 P.2d 1]; *People* v. *La Macchia,* 41 Cal.2d 738, 751 [264 P.2d 15], overruled on other grounds in *County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672, 680; *People* v. *Ocean Shore Railroad, supra,* 32 Cal.2d 406, 425-426; *Pacific Gas & Electric Co.* v. *Devlin,* 188 Cal. 33, 38 [203 P. 1058]; *Richmond Redevelopment Agency* v. *Western Title Guaranty Co.,* 48 Cal.App.3d 343, 350 [122 Cal.Rptr. 434]; *People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc., supra,* 253 Cal.App.2d 870, 881; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 755, 756).

---

[11]Evidence Code section 814, as presently existing, was added in 1975 and became operative July 1, 1976.

The California Public Utilities Commission, in the exercise of its jurisdiction over proceedings in eminent domain seeking condemnation of a public utility, has followed the general rule. In one of its recent decisions, *Re City of Riverside,* 74 P.U.C. 193, where a water company was taken by eminent domain proceedings, the commission, in determining just compensation for the taking, used "the concept of the highest price, estimated in terms of money, that a willing buyer would pay to a willing seller for the property if exposed for sale on the open market, where each is under no unusual pressures of time or circumstance and each has knowledge of all the uses and purposes to which the property is best adapted and for which it is reasonably capable of being used." The concept thus expressed is a statement of the general market value rule. Its use conformed to other commission rulings (see *Re Denair Community Services District,* 67 P.U.C. 476; *Aldercroft Heights Company,* 65 P.U.C. 416; *Re Monterey Peninsula Municipal Water District,* 63 P.U.C. 533; *Re City of North Sacramento,* 56 P.U.C. 554). In applying this concept the commission, in *City of Riverside,* used a method of approach upon which The Company relies, contending the commission's decision respecting such is authority for its position in the case at bench. We will consider this contention hereinafter.

■ Under the general rule, the knowledgeable and willing buyer and seller are assumed persons and the locale of their purchase and sale of the property taken is an assumed "open market" (*Joint Highway Dist. No. 9 v. Railroad Co., supra,* 128 Cal.App. 743, 757). The trier of fact, to the extent supported by the evidence, determines the price the seller and buyer would agree upon in the open market, subject only to the limitations imposed by Evidence Code section 813 which provides: "(a) The value of property may be shown only by the opinions of:

"(1) Witnesses qualified to express such opinions; and

"(2) The owner of the property or property interest being valued.

"(b) Nothing in this section prohibits a view of the property being valued or the admission of any other admissible evidence . . . for the limited purpose of enabling the court . . . to understand and weigh the testimony given under subdivision (a) . . . ." Thus, within the limits set by admissible opinion testimony of qualified experts, the jury or the court,

premised on its evaluation of the evidence in the case, determines the price upon which the assumed knowledgeable buyer and seller would agree (see *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 765; cf. *United States* v. *Toronto Nav. Co.,* 338 U.S. 396, 402 [94 L.Ed. 195, 200-201, 70 S.Ct. 217, 221]); in determining what factors would motivate them in reaching an agreement as to price, and in weighing the effect of their motivation, may rely upon the opinion of experts in the field and also upon its knowledge and experience shared in common with people in general (*Vallejo etc. R.R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, 576-577 [147 P. 238]); and draws its own conclusion of value by a process of balancing and reconciling the varying opinions on the subject (*City of Fresno* v. *Hedstrom,* 103 Cal.App.2d 453, 461 [229 P.2d 809]). The trial judge in the case at bench, in his memorandum opinion, refers to this process and the conclusions reached as "judgment decisions."

■ The evidence need not show the existence of an actual seller and buyer, or the existence of an actual market. A showing of potential sellers and buyers in a potential market will suffice (*City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 496; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 756).

The provisions of Evidence Code section 814, prescribing the foundational requisites to an opinion as to the value of property, sanction an opinion based on matters of a type that reasonably may be relied upon by an expert in forming such an opinion, including but not limited to the matters listed in sections 815-821, which, in substance, describe the appraisal trilogy consisting of three methods or approaches used by appraisers in forming an opinion as to market value (*State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson,* 5 Cal.App.3d 60, 63 [84 Cal.Rptr. 742]; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Covich, supra,* 260 Cal.App.2d 663, 665-666), i.e., market data, capitalization of income and reproduction cost (see also *De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 563-564 [290 P.2d 544]). The market data approach includes a consideration of comparable sales (Evid. Code, §§ 815, 816).

■ There is a distinction between a measure of just compensation in an eminent domain action and the methods used to determine the amount of that compensation under that measure. Rules of law establishing the former are substantive, while those fixing the latter are procedural. Thus, there is a distinction between "market value" as a

measure of just compensation and "market value" as the amount of that compensation determined by the market data approach. Although the latter is included in the former, the former is not limited to the latter. Confusion has followed a failure to appreciate the nicety of this distinction and has resulted in seeming exceptions to the general rule when applied to particular property. This confusion is exemplified in statements giving the impression market value as a measure of just compensation does not apply to the taking of a public utility because there is no market data upon which to premise a determination under such a measure.

In *Kimball Laundry Co.* v. *U. S.*, 338 U.S. 1, 5-6 [93 L.Ed. 1765, 1771-1772, 69 S.Ct 1434, 1438, 7 A.L.R.2d 1280], the court, after stating just compensation "is only that value which is capable . . . of exchange for some equivalent [and] [i]ts measure is the amount of that equivalent," stated, "[S]ince a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place. If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the *'market price'* becomes so important a standard of reference. But when the property is of a kind seldom exchanged, it has no *'market price,'* and then recourse must be had to other means of ascertaining value . . . ." [Italics ours.] It should be noted the court refers to "market price" rather than "market value." In similar vein the same court said, in *United States* v. *Toronto Nav. Co.,* *supra,* 338 U.S. 396, 402 [94 L.Ed. 195, 200-201, 70 S.Ct. 217, 221]: "At times, however, peculiar circumstances may make it impossible to determine a 'market value.' There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is 'no market' for the property in question. But that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property. We simply must be wary that we give these sparse sales less weight than we accord 'market' price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer. And it is here that other means of measuring value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid." In each of these decisions it is apparent the court was referring to the inadequacy of the

market data approach to a determination of "market value" rather than to the inadequacy of "market value" as a measure of just compensation. In suggesting other methods of determining "value" may be relevant to the issue respecting the price a "hypothetical buyer" or "prospective purchaser" would pay for the property taken, the court relied upon the general market value rule as the measure of "just compensation."

The Company has cited the foregoing cases, among others, in support of its contention the trial court erred in adopting "market value in its usual sense" as the measure of just compensation for taking a public water utility because it is a rarely traded, highly regulated, special use property. In effect, The Company is contending, among other things, market value is not *a measure* of "just compensation" where market data to determine such is unavailable. The cited cases do not support this position. Market value under the general rule may be determined in many ways, none of which is exclusive (*State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson, supra,* 5 Cal.App.3d 60, 63) and only one of them relies on market data, i.e., the market data approach.

■ The Company also cites and places major reliance on the statement in *Citizens Utilities Co.* v. *Superior Court,* 59 Cal.2d 805, 817 [31 Cal.Rptr. 316, 382 P.2d 356], that: " 'Fair market value' is not the exclusive standard by which to measure just compensation, and it is widely recognized that such a standard is meaningless when, as here, a public utility is being condemned." That case did not involve a consideration of the measure of just compensation for taking a profitable operating public utility by an action in eminent domain. Instead, the issue of just compensation in the case was limited to the measure thereof for taking improvements added to the public utility after an award for its taking had been made in the action but before the award had been paid. None of the decisions cited in support of the statement upon which The Company relies involved an eminent domain action to acquire a public utility and, thus, did not consider the measure to be used in determining just compensation in such an action. In *State* ex rel. *Herman* v. *Southern Pacific Co.,* 8 Ariz.App. 238 [445 P.2d 186, 189], the court characterized the statement in *Citizens Utilities Co.* as dicta. We agree with this characterization.

The statements of law in an opinion are to be understood in the light of the facts and the issues before the court (*Porter* v. *Bakersfield & Kern Elec. Ry. Co.,* 36 Cal.2d 582, 590 [225 P.2d 223]).

We conclude the statement in the *Citizens Utilities Co.* case does not foreclose application of the general market value rule as stated in this opinion to the circumstances in the case at bench.

Statements in The Company's briefs on appeal contribute to the confusion respecting the meaning of terms of value relating to the market and their relationship to the general market value rule as a measure of just compensation. Thus, The Company contends "market value *in its usual sense* is not the measure of just compensation in this case because the public utility enterprise here taken is special use property, possesses going concern value and other intangible assets, and is not regularly traded in a free, fair or open market"; "*Market value* is not synonymous with just compensation when rarely traded special use property is condemned"; "Evidence of *market value* based on alleged market sales data should have been excluded (1) because *usual* market value is not the standard . . ."; reconstruction is the measure to be applied "when *traditional* market value fails"; and some courts "continue to verbally adhere to the 'market value' test, despite the substantial *absence of market sales data.*" On the other hand, The Company contends: "The proper standard of just compensation in this case is the fair *market value* of all of defendant's tangible and intangible properties valued in a *hypothetical* fair and open market." [Italics ours.]

█ In reality, The Company's contentions, considered as a whole in the light of the general market value rule as stated in this opinion, are not a complaint against the use of that general rule, which was followed by the trial court, but are objections to the bases or approaches used by the court in applying that rule; the court's rejection of the opinions of its experts on "just compensation" and of the reconstruction-cost-new-less-observed-depreciation basis or approach they used in reaching their opinions; to the court's alleged acceptance of the opinions of The Irrigation District's experts on "market value" because the hypothetical "open market" they considered did not include public agencies among the prospective hypothetical buyers in that market and were premised on the capitalization-of-income basis or approach, which should not be used in determining the market value of a public utility; to the court's consideration of market data in applying the general market value rule; and to the alleged fact the court and The Irrigation District's experts did not include alleged compensable elements of value in determining the "just compensation" to be awarded.

The opinion of the witness Barr, who was president of the parent company, that "just compensation" for taking its property was an amount between $38,570,956 and $41,070,956 was based on accumulation of the market value of its land in an unimproved or raw state, the value of the improvements thereon determined by the reconstruction-cost-new-less-observed-depreciation basis or approach, the going concern value of the enterprise and the value of other items, tangible and intangible. Barr applied the hypothetical buyer and seller agreement rule to the broad issue of "just compensation" and premised his opinion on the amount they would agree upon "if they were free of control and regulation over the earning power, the earnings of the entity, and free of any governmental control as to the price they could pay . . . ."

The opinion of the witness Housiaux that "just compensation" for the taking was $50 million was based on the reconstruction cost of the water system plus the value of its intangible assets appraised at $12,905,000 to $13,053,000. Included in the latter were going concern, land acquisition and construction costs, franchises and consents, and books, records and documents.

The record supports the conclusion the trial court, under the evidence, did not abuse its discretion in rejecting these opinions or the use of the reconstruction-cost-new-less-observed-depreciation basis or approach in reaching them, or in determining the issue of market value under the general rule.

■ The weight to be given a method or approach to an opinion or determination of market value should be considered in the light of the views of the hypothetical buyer and seller respecting the results from the use of that method or approach and the factors considered in applying it to the circumstances at hand (Evid. Code, § 814; *United States* v. *Toronto Nav. Co., supra,* 338 U.S. 396, 402 [94 L.Ed. 195, 200-201, 70 S.Ct. 217, 221]; *People* ex rel. *Dept. Pub. Wks.* v. *Leadership Housing Systems, Inc.,* 24 Cal.App.3d 164, 169-170 [100 Cal.Rptr. 747]). ■ The evidence justifies the conclusion a hypothetical buyer would consider $38 million an unreasonable price to pay for The Company's enterprise in the light of, among other things, the age of the improvements (see *Redevelopment Agency* v. *Del-Camp Investments, Inc.,* 38 Cal.App.3d 836, 842 [113 Cal.Rptr. 762]), the method or approach used by its experts in determining depreciation, i.e., observed depreciation (see *Pacific Gas & Electric Co.* v. *Devlin, supra,* 188 Cal. 33, 46-47), governmental restrictions on the income an investment therein might produce (cf. *City of Los*

*Angeles Dept. of Water and Power,* 32 C.R.C. 579, 582), and the fact less than four years earlier it was one of six water systems purchased by The Company for the total price of $41,290,517.56. The witness Barr, as president of the parent company, was instrumental in negotiating the 1966 purchase of the six water systems by The Company, which was preceded by the parent company's bid of $41 million. There is no showing this bid was the product of a reconstruction-cost-new-less-depreciation basis or approach to value. On the other hand, the evidence supports the conclusion the bid and subsequent sale were premised on a consideration of the rate base for the water systems purchased, plus a premium, with acceptance by the buyer of the fact the return on its investment would be regulated by the Public Utilities Commission using the rate base as the investment factor. This transaction indicates a public utility purchaser might be willing to accept a lesser return on its investment than otherwise obtainable because of the advantages incident to a monopolistic type of operation.

Reproduction-cost-new-less-depreciation, and its alternative, used by The Company's opinion witnesses, reconstruction-cost-new-less-observed-depreciation, are acceptable bases for or approaches to an opinion or determination of the market value of property taken in an eminent domain action; are not dispositive bases or approaches, nor "market value" nor, per se, a measure of "just compensation"; but, rather, are aids to a determination of "market value" as the measure of "just compensation" (*People* v. *Ocean Shore Railroad, supra,* 32 Cal.2d 406, 427-428; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson, supra,* 5 Cal.App.3d 60, 63; *City of Pleasant Hill* v. *First Baptist Church,* 1 Cal.App.3d 384, 397, fn. 1 [82 Cal.Rptr. 1]; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 759-760; *Fairfield Gardens, Inc.* v. *United States,* 306 F.2d 167, 173; *United States* v. *Certain Interests in Property, etc.,* 296 F.2d 264, 270; see also *City of Reading,* 39 C.R.C. 195). In *People* v. *Ocean Shore Railroad, supra,* 32 Cal.2d 406, 427-428, the court said: "In a number of cases it has been held proper to admit evidence of reproduction cost as an aid to determining value, especially when the property is adapted to a particular enterprise and there are ordinarily no willing buyers and hence no market for that type of property. [Citation.] It has also been held that reproduction cost is a proper test where there is a taking of a going concern with a view to continuing the operation. [Citation.] The general rule, however, is that the proper measure of damages is not the market value of the land plus the reproduction cost of the improvements,

but the market value of the property as improved, in view of all the uses to which it is adaptable and available. . . .

"The mere fact that a structure or improvement may have cost a certain amount, or that it would cost that amount to reproduce it, is not conclusive proof of its value in the market, or that a purchaser would be willing to pay that sum."

Reproduction or reconstruction-cost-new-less-depreciation has been used in commission eminent domain proceedings to fix upper limits of market value (*City of Los Angeles Dept. of Water and Power,* 37 C.R.C. 117; *City of Los Angeles Dept. of Water and Power,* 32 C.R.C. 579; *City and County of San Francisco,* 33 C.R.C. 202); and in proceedings where the operation of a public utility company was not profitable (*Eureka II,* 18 C.R.C. 952; *Fair Oaks Irrigation District,* 15 C.R.C. 304). In *City of Los Angeles* v. *Klinker,* 219 Cal. 198, 211 [25 P.2d 826, 90 A.L.R. 148], the court made the statement, which was dicta in the case, that reconstruction cost might be a criterion for establishing market value where, under peculiar circumstances, no other criterion would be appropriate. The case at bench is not within any of the foregoing situations.

On the other hand, it has been said: "Generally speaking, reproduction cost is not considered the best evidence of fair market value if other evidence is available." (*United States* v. *55.22 Acres of Land, etc., Yakima Co., Wash.,* 411 F.2d 432, 435); and "[R]eproduction cost evidence almost invariably tends to inflate valuation," because it sets an absolute ceiling on market price "which may not be, and most frequently is not, even approached in actual market negotiations." (*United States* v. *Benning Housing Corporation,* 276 F.2d 248, 250.)

In any event reproduction or reconstruction-cost-new-less-depreciation as an aid to determining market value, as well as other aids; e.g., market data and capitalization of income, are relevant to that issue only to the extent they develop factors which hypothetical buyers and sellers would consider in determining the price to be paid for the property under consideration (*United States* v. *Toronto Nav. Co., supra,* 338 U.S. 396, 402 [94 L.Ed. 195, 200-201, 70 S.Ct. 217, 221]; *United States* v. *55.22 Acres of Land, etc. Yakima Co., Wash., supra,* 411 F.2d 432, 435; *United States* v. *Certain Interests in Property, etc., supra,* 296 F.2d 264, 270; *People* ex rel. *Dept. Pub. Wks.* v. *Leadership Housing Systems, Inc., supra,* 24 Cal.App.3d 164, 169-170).

As noted, The Company cites the decision in *City of Riverside,* 74 P.U.C. 193, in support of its position, relying on the fact in the eminent domain proceeding there under consideration the commission accepted opinions of value based on the reproduction-cost-new-less-depreciation approach and rejected those based on the capitalization-of-income approach. Such a proceeding simulates an action in a trial court. The commission is the trier of fact; evaluates the evidence; and makes its findings. Its written opinion, like the memorandum decision of the trial judge in the case at bench, sets forth the process by which it reached its conclusions. Its decision is subject to judicial review simulating appellate review of a judgment of the trial court (*Southern Calif. Edison Co.* v. *Railroad Com.,* 6 Cal.2d 737, 749 [59 P.2d 808]). Whether the commission in the *City of Riverside* proceeding properly exercised or abused its discretion in rejecting opinions based on the capitalization-of-income approach and accepting those based on the reconstruction-cost approach has not been judicially determined. The issue at bench is whether the trial judge in the action at bench properly exercised or abused his discretion. Each determination must be made in the light of the evidence in the respective cases, i.e., proceeding or action. However, from the opinion in the *City of Riverside, supra,* 74 P.U.C. 193, we note the broad scope of the process used by the commission in reaching its conclusion based on the particular evidence in that particular case, as is evident in the following statements: "In reaching our ultimate findings herein we have given due consideration to what is revealed *by the entire record,* as well as to those matters which, in our opinion, would be considered by the hypothetical 'knowledgeable willing buyer and seller,' . . .

"Although present and potential earning power of a regulated public utility *can affect its market value* either positively or adversely, depending on a number of variable factors which we have considered and weighed in connection with the studies and testimony on that element in this record, we are of the opinion that 'market value', or 'just compensation', *in this case* should be approached by according greater weight and reliability to values represented by physical and *intangible assets* of the properties involved." [Italics added.] We also note, the commission apparently misunderstood the effect of Evidence Code section 819 as applied to the condemnation of a profitably operating public utility in its entirety. We consider this matter hereafter.

We are not persuaded by the opinion of the Public Utilities Commission in *City of Riverside* that the trial court in the case at bench abused its

discretion, under the evidence in this case, in giving greater weight to opinions of value based on the capitalization-of-income approach than to those based on the reconstruction-cost approach.

It should be noted, the trial court in the case at bench did not conclude the reconstruction-cost approach to a determination of value, and the opinions based thereon, should not be considered, but, rather, concluded, under the circumstances, they should be given little weight.

The Company's attack upon the trial court's use of the capitalization-of-income approach, and the opinions based on this approach, is premised on erroneous concepts of the law and on arguments directed to the weight of the evidence rather than its sufficiency as a matter of law.

The Company contends the trial court relied on the capitalization-of-income approach as the sole test in determining market value of The Sweetwater System. The trial judge's memorandum decision belies the contention.

The Company states parenthetically the court and The Irrigation District's opinion witnesses deemed rate base the equivalent of capitalized income. This is an interpretation it places on the evidence rather than a fact. The opinions of market value based on the capitalization-of-income approach and other considerations exceeded the rate base to which the witnesses testified. ■ In considering capitalization of income as an approach to an opinion or determination of market value, the witnesses and the court were entitled to conclude the prospective income a purchaser of the water system would receive in the reasonably foreseeable future following an assumed sale would equate the average thereof received during the period 1965 through 1968, which approximated $1 million a year, or would be in an amount premised on a calculation using the rate base and a probable allowed future rate of return thereon not to exceed 7.8 percent, which is the rate of return the trial judge referred to in his memorandum decision as a "probable allowance." Having established the probable net income from the investment, the calculation to determine the amount of the investment depends upon the percentage of profit the hypothetical buyer reasonably might expect from his investment (gen. see *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564-565).[12]

---

[12]In *Southern Calif. Edison Co.* v. *Railroad Com.,* 6 Cal.2d 737, 753 [59 P.2d 808], the court, in considering a contention respecting a reasonable return on an investment, said it would seem to be true generally "that a seven per cent return on the investment is reasonable."

In the event the rate of return allowed by the commission and the rate of return the hypothetical buyer might reasonably expect are the same, the rate base and investment would be the same. On the other hand, if the two rates of return differ, rate base and investment would not be the same.

In any event, the owner of a public utility is entitled to receive only the profit allowed by the commission, and capitalization of that profit is a factor the trial court may conclude a hypothetical buyer and seller would consider in negotiating the price to be paid for the utility purchased.

Capitalization of income is "a generally accepted method of valuing property from which income may be or is derived." (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564; see also *South Utah Mines & Smelters* v. *Beaver County,* 262 U.S. 325, 330 [67 L.Ed. 1004, 1007, 43 S.Ct. 577, 579]; *Southern Calif. Edison Co.* v. *Railroad Com., supra,* 6 Cal.2d 737, 751-753; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson, supra,* 5 Cal.App.3d 60, 63; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Covich, supra,* 260 Cal.App.2d 663, 665-666; *City of Riverside, supra,* 74 P.U.C. 193; *Re Denair Community Services District, supra,* 67 P.U.C. 476, 481; *Re Monterey Peninsula Municipal Water District, supra,* 63 P.U.C. 533, 537; *Re Sacramento Municipal Utility District,* 44 C.R.C. 467, 475; see also *City of Thibodaux* v. *Louisiana Power & Light Co.,* 225 F.Supp. 657, 667 [rule applied to condemnation of an electrical power distribution system].)

█ The Company and amici curiae contend capitalization of income other than rentals, as a basis or approach in determining market value of property, is proscribed by Evidence Code section 819, which reads: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the capitalized value of the reasonable net rental value attributable to the land and existing improvements thereon (as distinguished from the capitalized value of the income or profits attributable to the business conducted thereon)." The phrase "value of property" as used in the section means the amount of "just compensation" to be awarded in an eminent domain action (Evid. Code, § 811). The section is a codification of the rule in *People* v. *Dunn,* 46 Cal.2d 639, 641 [297 P.2d 964], which applies to a determination of the market value of land and the improvements thereon. The reason for the rule is that profits derived from a business conducted on land, with or without improvements, is too speculative,

uncertain and remote to be considered as a basis for ascertaining market value of the land, with or without improvements. The reason is not applicable where the property is a business or enterprise, such as a public utility, including all of its assets, tangible and intangible. The section is limited in application to the determination of "just compensation" for taking land and existing improvements thereon, rather than for taking a business.

By virtue of Evidence Code section 814, an opinion and determination of the market value of condemned property may be based on matters which the hypothetical buyer and seller described in the general market value rule would consider in determining the price at which to purchase and sell the property under consideration "including but not limited to the matters listed in Sections 815-821" of that code (see also *City of Santa Barbara* v. *Petras,* 21 Cal.App.3d 506, 510 [98 Cal.Rptr. 635]); and thus capitalization of the income of a condemned public utility, which is not a matter included in Evidence Code section 819, may be a basis for such an opinion or determination.

However, The Company contends the use of capitalization of income as a basis or approach to an opinion or a determination of the market value of a public utility, in an eminent domain action, denies the owner thereof just compensation where, as in the case at bench, the income thereof is depressed by legislatively imposed rate regulations. Included in this contention is the claim governmentally imposed restrictions on the scope of the rate base, as an indicator of investment, "destroys" assets not included therein, excludes them from consideration and denies the owner just compensation therefor; and the further claim when capitalization of income is used in such an action to determine market value, the Legislature rather than the court determines just compensation.[13]

A diminution in the value of property resulting from a valid exercise of the police power is not a compensable item of damage (*Consolidated Rock Products Co.* v. *City of Los Angeles,* 57 Cal.2d 515, 530 [20 Cal.Rptr. 638, 370 P.2d 342]; *Beverly Oil Co.* v. *City of Los Angeles,* 40 Cal.2d 552, 557 [254 P.2d 865]; *Archer* v. *City of Los Angeles,*

---

[13]The Company's contention is not addressed to a situation where the state, acting through one public agency, depresses the price of property, arbitrarily and in bad faith, for the purpose of acquiring it by eminent domain through another public agency, e.g., see *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.,* 33 Cal.App.3d 960, 965 [109 Cal.Rptr. 525]).

19 Cal.2d 19, 23-24 [119 P.2d 1]; *Dale* v. *City of Mountain View,* 55 Cal.App.3d 101, 108 [127 Cal.Rptr. 520]); and will not support an award in the amount thereof as just compensation in an eminent domain action (*HFH, Ltd.* v. *Superior Court,* 15 Cal.3d 508, 518, 522 [125 Cal.Rptr. 365, 542 P.2d 237]).

In an analogous situation, the Supreme Court of the United States held the ceiling market price governmentally imposed on the sale of property, as a valid exercise of the police power, was just compensation for taking that property (*United States* v. *Commodities Corp.,* 339 U.S. 121, 123-126, 128, 131 [94 L.Ed. 707, 711-716, 70 S.Ct. 547, 549-550, 552, 553]).

The Sweetwater System, when purchased by The Company, was dedicated to a public use, as a public utility. As such it is subject to the right of the public to "insist upon service faithfully and impartially and at no more than reasonable rates"; to regulations of the Public Utilities Commission fixing those rates, which are subject to judicial review; and to acquisition by a public agency of the state in an eminent domain proceeding in which a necessary element in the ascertainment of its market value is its productiveness (*Southern Calif. Edison Co.* v. *Railroad Com., supra,* 6 Cal.2d 737, 751-755). The only constitutional restriction upon the rate-making power of the commission is that it shall not be confiscatory (*Contra Costa Water Co.* v. *Oakland etc.,* 159 Cal. 323, 334 [113 P. 668]). If the allowed rate is confiscatory, the owner of the utility may obtain appropriate judicial relief (*Union Hollywood W. Co.* v. *Los Angeles,* 184 Cal. 535 [195 P. 55]).

 Moreover, the fact capitalization of income from The Sweetwater System as a basis or approach to an opinion or determination of the market value of the system was predicated on a rate base which did not include all items of value The Company claims were a part of the system is irrelevant to a determination of the constitutional issue The Company asserts. The components of the rate computation, i.e., rate base and allowable rate of return on investment, are those the commission finds will produce a rate for the service rendered by the utility which is reasonable in the light of its dedication to a public use (gen. see *Contra Costa Water Co.* v. *Oakland etc., supra,* 159 Cal. 323, 335). Thus, to effect a reasonable rate of return for the service rendered, the commission may adopt methods of fixing rate bases which result either in a high rate base or a low rate base and apply thereto,

respectively, a low rate of return or a high rate of return. Demonstrative is the action of the commission respecting the Loveland dam investment where it concluded the total investment therein was not essential to The Company's public utility service and, rather than apportion the investment, allowed a 4.45 percent rate of return thereon instead of the then allowable 6.5 percent return, which reduced The Company's overall rate of return to 6 percent. (See fn. 1, *ante*, p. 959.) The method used to fix rates, absent a showing they are confiscatory, is a matter for legislative or administrative determination by the commission. In the ultimate, the productivity of a public utility as an investment, because of its dedication to a public use, is fixed by the Public Utilities Commission as an agency of the state in the exercise of its police power. In the case at bench, as in *Southern Calif. Edison Co.* v. *Railroad Com., supra,* 6 Cal.2d 737, 754, it cannot be said, as a matter of law, the trial court erred in accepting the results of the method used by the commission to fix the amount of The Company's allowable return on investment as a basis for an application of the capitalization-of-income approach to the extent the court relied upon the use of that approach in determining the market value of The Company's property.

 Lawful legislative and administrative restrictions on the use of property are factors the knowledgeable, willing buyer and seller would consider in agreeing upon a price to be paid therefor, and may be considered by the court in making its determination of market value (*People* ex rel. *Dept. of Public Works* v. *Donovan,* 57 Cal.2d 346, 352 [19 Cal.Rptr. 473, 369 P.2d 1]; *Long Beach City H.S. Dist.* v. *Stewart,* 30 Cal.2d 763, 766 [185 P.2d 585, 173 A.L.R. 249]; *County of Santa Clara* v. *Curtner,* 245 Cal.App.2d 730 [54 Cal.Rptr. 257]; *United States* v. *Delano Park Homes,* 146 F.2d 473, 474; *American-Hawaiian Steamship Co.* v. *The United States,* 124 F.Supp. 378, 382 [129 Ct.Cl. 365]).

 Contrary to The Company's contention, the court and not the Legislature, acting through the Public Utilities Commission, determined the issue of just compensation in the case at bench, even though the court accepted the capitalization-of-income basis or approach in making its determination. The court considered capitalization of income only as one of several factors the willing seller and buyer would consider in reaching an agreement as to price; did not accept the opinions on market value of The Irrigation District's valuation experts because they did not

give adequate consideration to factors other than capitalization of income; and made an award greatly in excess of rate base.[14]

■ Also without merit is The Company's further objection to use of the capitalization-of-income basis or approach in the case at bench because the rate base used to determine its allowable profit was premised on the historical cost of its assets, i.e., original-cost-less-straight-line depreciation. Even assuming this is an issue which may be decided in an eminent domain action, the method of determining the allowable profit on The Company's investment was a matter with which a court will not interfere absent a showing the rates fixed pursuant thereto are confiscatory, and no such showing is made (*Power Comm'n v. Hope Gas Co., supra,* 320 U.S. 591, 602 [88 L.Ed.333, 344-345, 64 S.Ct. 281, 287]; *Contra Costa Water Co. v. Oakland etc., supra,* 159 Cal. 323, 333-337).

The Company also contends the court should not have accepted the opinions of market value by The Irrigation District's valuation witnesses because the "open market" they used in reaching their opinions was closed to public agencies by instructions from counsel for The Irrigation District. These instructions were premised on, but broader than, the restrictions prescribed by Evidence Code section 822, subdivision (a), that: "The price or other terms and circumstances of an acquisition of property or a property interest if the acquisition was for a public use for which the property could have been taken by eminent domain" is inadmissible as evidence and is not a proper basis for an opinion as to the value of property in an eminent domain action. The section forecloses the use of evidence concerning "*an* acquisition" which "*was* for a public use." [Italics ours.] The plain intent thereof is to foreclose only the use of market data premised on a particular acquisition by a public agency, including an acquisition by sale or otherwise. In substance, the section is a codification of the decisional general rule foreclosing the use of allegedly comparable sales to a public agency for a public use (*City of Los Angeles v. Cole,* 28 Cal.2d 509, 516-518 [170 P.2d 928]) and a rejection of the exception thereto applied in *County of Los Angeles v. Faus, supra,* 48 Cal.2d 672, 678. ■ The reason for the general rule is that the price paid under the circumstances of such a sale is not a reasonable or fair test of market value (*City of Los Angeles v. Cole, supra,* 28 Cal.2d 509, 517-518; see also *County of Los Angeles v. American Sav. & Loan Assn.,* 26 Cal.App.3d 7, 12-13 [102 Cal.Rptr. 439]).

---

[14]The award approximates 136 percent of rate base as the latter was shown on the books of The Company.

It is not the intent of the section to foreclose the use of evidence, other than evidence of the price or other terms and circumstances of a particular acquisition, showing the factors a hypothetical public agency buyer and a hypothetical seller would consider in reaching an agreement as to the price of property which is the subject of an eminent domain action by a public agency (cf. *County of Los Angeles* v. *American Sav. & Loan Assn., supra,* 26 Cal.App.3d 7, 13). Included in the latter is evidence of the fact, as noted by the trial judge in his memorandum decision, that "historically governmental agencies have paid a premium over earnings when acquiring utility properties," and that a public agency may agree upon a price more favorable to the seller than a private investor would agree upon.

The instructions from counsel for The Irrigation District to its valuation witnesses appear to have foreclosed consideration of matters the hypothetical public agency buyer and the hypothetical seller of a public utility would consider in reaching an agreement as to price. On the other hand, the instructions properly foreclosed consideration of the price or other terms and circumstances of specific sales to public agencies. Much of the testimony of the valuation witnesses was not affected by the instructions, as for example, the testimony on capitalization of income. Although one of the witnesses testified his opinion as to market value would have been higher but for the instructions from counsel, it is evident he intended to use market data from specific sales to public agencies as a basis for his approach in reaching the latter opinion, which is proscribed, as well as a consideration of factors generally considered by a hypothetical buyer and seller in negotiating a sale to a public agency.

 When the testimony of a valuation witness is based on considerations which are proper as well as those which are improper, the court, in its discretion, may strike the testimony or permit it to remain and consider the impropriety in determining the weight to be given it (*San Bernardino County Flood Control Dist.* v. *Sweet,* 255 Cal.App.2d 889, 902 [63 Cal.Rptr. 640]; *Buena Park School Dist.* v. *Metrim Corp.,* 176 Cal.App.2d 255, 262 [1 Cal.Rptr. 250]); and, in any event, where it appears the trial court did not rely upon the improperly admitted evidence, or it is not of a determinative character, any error in its admission is not prejudicial (*Rose* v. *State of California,* 19 Cal.2d 713, 743 [123 P.2d 505]; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 762; see also *City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 489).

As indicated in the memorandum decision of the trial judge, in weighing the valuation testimony of the witnesses in question the trial court rejected the concept Evidence Code section 822, subdivision (a), closed the "open market" to public agency buyers; did not accept their opinions as to market value to the extent they imposed a maximum thereon; and concluded the market value in question was much higher.

Any failure on the part of the court to sustain objections to the whole of the testimony of The Irrigation District's valuation witnesses was not error; and, in any event, any claimed error was not prejudicial for the reasons stated.

The Company claims the capitalization-of-income approach, as used by The Irrigation District's valuation witnesses, was improper because it did not consider probable income from nonutility uses of its property, such as income from its use for rock and gravel sites and from probable sales of a part of the real property for residential or industrial purposes.

There was evidence of income from the sporadic use of parts of The Company's property as rock and gravel sites. However, the showing of continuity of income from this source, or its amount on a yearly or other periodic basis, was unsatisfactory. Whether the failure to consider such income in the capitalization-of-income approach was significant, or otherwise, was a matter going to the weight of the opinions on market value based on that approach, rather than to the admissibility of those opinions.

There also was evidence the Sweetwater dam-site, or parts of it, might be used for residential purposes in view of the fact the land adjoining the site is used for these purposes. Proceeds from the sale of the property would not be a source of income from the property for capitalization purposes, but a change in the form of capital. The probable use of a part of the property for residential or other purposes was a factor for consideration in determining the weight to be given the capitalization-of-income approach as an aid in determining market value, but the probable proceeds from a probable sale thereof had no place in the calculations applicable to that approach.[15]

The trial court, in determining market value, as indicated in the memorandum decision of the trial judge, considered the fact parts of The

[15]In any event, consideration of prospective proceeds from sales of The Company's real property for a particular use would violate the rule foreclosing consideration of the money value of property for a particular use in determining its market value (*San Bernardino County Flood Control Dist.* v. *Sweet*, 255 Cal.App.2d 889, 900 [63 Cal.Rptr. 640], as cases cited *post*).

Company's real property might be released from public utility service and sold for other purposes. Although considering the probability of such a release and sale to be minimal, the trial judge said, " . . . an *informed purchaser could well give it some consideration.*"

■ A probable prospective use of property is a factor to be considered in determining market value, i.e., a factor the hypothetical buyer and seller would consider, but the money value of the property for that use is not an independent element of market value (*City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 488-489; *People* v. *Ocean Shore Railroad, supra,* 32 Cal.2d 406, 425-426;[16] *Sacramento etc. R.R. Co.* v. *Heilbron, supra,* 156 Cal. 408, 412; *In re Marriage of Folb,* 53 Cal.App.3d 862, 869 [126 Cal.Rptr. 306]; *City of Pleasant Hill* v. *First Baptist Church, supra,* 1 Cal.App.3d 384, 398-399 [82 Cal.Rptr. 1]; *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 899-900 [factually in point]; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 758-760).

The Company claims, because there was a reasonable probability some of its real property might be released from public use and sold for residential or other purposes, it should have been separately valued but was not treated thus in the capitalization-of-income approach, which is an additional reason that approach should not have been applied in the case at bench. The basic premise in this argument violates two general rules: (1) the money value of property for a particular use may not be considered in determining the value of the property for all uses, or, stated otherwise, the market value of property may not be determined by totaling the money value of parts thereof for particular uses (*San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 900); and (2) the market value of land and the improvements thereon is the market value thereof viewed as a whole and not separately (*City of Los Angeles* v. *Klinker, supra,* 219 Cal. 198, 211).

[16]In *People* v. *Ocean Shore Railroad,* 32 Cal.2d 406, 426 [196 P.2d 570, 6 A.L.R.2d 1179], the court said " . . . where it is not shown that a suggested use would be profitable, or where it appears that the operations cannot be carried on except at a loss, the prospect of use for such a purpose is not a proper element of value." In the case at bench there was no showing respecting the probability the Sweetwater reservoir would be released from public utility service; when this might occur; the property would be rezoned for residential or other purposes; or the changeover was financially feasible (gen. see *Buena Park School Dist.* v. *Metrim Corp.,* 176 Cal.App.2d 255, 260 [1 Cal.Rptr. 250]). However, we have assumed such probability because the trial judge accepted the premise a reasonably immediate future use of the property for residential or other purposes was a probability which should be considered in determining market value.

The foregoing claims, in effect, are arguments advanced in support of The Company's contention the reconstruction-cost-new-less-depreciation approach should have been accepted by the trial court as the sole approach to a determination of market value in the case at bench or, at least, should have been given major consideration. However, as heretofore noted, the weight to be given any of the approved approaches to a determination of market value in the case at bench was a matter for determination by the trier of fact in the exercise of judicial discretion which, absent a showing of abuse, will not be interfered with on appeal. Under the evidence in the case, the determination of the trial court did not constitute such an abuse.

In similar vein, The Company claims "going concern," organization and construction costs, franchises and consents, contributed property,[17] and books, records and documents were not included in rate base; should have been valued separately; and the failure of The Irrigation District's valuation witnesses to do so in reaching their opinions as to market value requires rejection of those opinions as a matter of law.

The eminent domain action at bench is materially different from other such actions because the subject of this action is a going business enterprise including, with minor exceptions, all of its assets, real and personal, tangible and intangible, and the return on its investment in that enterprise is subject to and has been regulated by the state in the exercise of the police power. However, the differences noted, per se, do not require the application of different general rules in determining the "just compensation" to be awarded, including the general market value rule as a measure thereof; nor, per se, eliminate the judicial discretion vested in the trial court to apply those methods of determining market value which it concludes, under the evidence, should be applied; nor, per se, control the action of the court respecting the weight to be given the evidence or those methods in determining "market value."

All of the items to which The Company directs attention are comparable to the extent they are not included in rate base;[18] but are a part of the enterprise the district will acquire through this action.

[17]Contributed property consists of improvements subdividers contributed to The Company in order to obtain services they otherwise would not have received.

[18]It should be noted, however, at least some of the contributed property not included in rate base may have been repaired or replaced by The Company, and to this extent it

It does not appear The Company sought judicial review of any order fixing its rates on a rate base that did not include these items. Thus, whether a different rate of return on investment would have been allowed had these items been included does not appear; and the fact remains, the total income from The Company's investment, i.e., the productivity of the enterprise, is the income allowed by the Public Utilities Commission.

When itemized, the intangible assets of an enterprise such as a public utility, including its "going concern," its organization and construction costs and its franchises, have a value in addition to the value of its physical property, including its land and improvements, its contributed property, and its books, records and documents (*McCardle* v. *Indianapolis Water Co.,* 272 U.S. 400, 413 [71 L.Ed. 316, 325-326, 47 S.Ct. 144, 149]; *Kimball Laundry Co.* v. *U. S.,* 338 U.S. 1, 12 [93 L.Ed. 1765, 1775-1776, 69 S.Ct. 1434, 1441]; *Puget Sound Power & Light Co.* v. *City of Puyallup,* 51 F.2d 688, 694; see also *Community Redevelopment Agency* v. *Abrams, supra,* 15 Cal.3d 813, 821, fn. 6). However, this does not mean, in forming an opinion respecting or determining "market value" of the enterprise, valuation witnesses or the court must segregate and evaluate separately each intangible asset and each physical asset, add them together, and conform their opinions and determinations accordingly. The use of such a process is proper in applying the reconstruction-cost-less-depreciation approach; is one of the reasons the use of that approach results in an inflated "market value"; and is not a part of the calculation involved in an application of the capitalization-of-income approach. When the capitalization-of-income approach is used as a basis for an opinion of or considered in determining the market value of an operating enterprise, the result is a determination of the total value of all of the items of property which are a part of that enterprise.

In *United States* v. *Certain Interests in Property, etc., supra,* 296 F.2d 264, 269-270, the court said: " . . . the value of the property as a 'going concern' was certainly included in the selection by the commission and the District Court of the rate of interest used in the capitalization-of-income formula. The very use of the capitalization-of-income method of evaluation assumes the valuation of the property as a going concern;

has been reimbursed therefor through the rate-fixing process. Also, it has been suggested, the books, records and documents of The Company, although not a part of rate base, were the product of services which The Company claimed as expenses includable in the allowed rate charged for its services.

to add a separate item labeled 'going concern value' would result in duplication."

In *Appleton Waterworks Co.* v. *Railroad Commission,* 154 Wis. 121 [142 N.W. 476, 484], "going concern" was referred to as "going value" and, pertinent to the issue at hand, the court said: ". . . . the fundamental difficulty with the attempt to set a definite sum as the measure of going value is that it is an attempt to divide a thing which is, in its nature, practically indivisible. The value of the plant and business is an indivisible gross amount; it is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all, not as separate things, but as inseparable parts of one harmonious entity, and exercising the judgment as to the value of that entity. In this way the going value goes into the final result, but it would be difficult for even an expert to say how many dollars of the result represent it."

In *Puget Sound Power & Light Co.* v. *City of Puyallup, supra,* 51 F.2d 688, 694, where the value of a public utility franchise, as a separate item, was under consideration, the court made this statement: "It should be borne in mind that the question involved is the market value of the property taken, including as it necessarily would the franchise under which the company is operating.

". . . . . . . . . . . . . . . . . .

"It must have been clear to the witnesses who testified as to the market value of the property sought to be condemned that the taking over of this property by the city would necessarily appropriate the franchise, and that the right of the appellant [the public utility] to operate as a going concern was entirely dependent upon the franchise, and they evidently considered that fact in fixing the market value."

There is no evidence in the case at bench The Irrigation District's valuation witnesses excluded "going concern" or any of the other items of claimed value allegedly not considered by them in applying the capitalization-of-income approach to their conclusions of market value.

The trial judge's comment on "going concern" as a factor the hypothetical buyer and seller would consider in reaching an agreement

was prompted by the apparent belief The Irrigation District's valuation witnesses may not have given this factor adequate consideration when they accepted the results of their capitalization study as the approximate equivalent of market value. Nevertheless, he made it clear, " . . . no separate treatment thereof is required except where it may merit consideration as part of a reconstruction cost study." The lack of any comment by the judge respecting other items of value considered by the witness Barr in his reconstruction cost study is of no consequence. The capitalization-of-income approach upon which the judge placed major, but not complete, reliance in determining the issue of market value of The Sweetwater System as an operating enterprise capitalizes in toto all items of value which are a part of that enterprise.

As a further reason for not accepting the opinions of The Irrigation District's valuation witnesses as to market value, to the extent those opinions placed a maximum on the amount thereof, the trial judge expressed the belief they had not given adequate consideration to the sale in 1966 by which The Company acquired The Sweetwater System. The Company contends admission of the evidence respecting this sale, as well as that respecting the sale of the Palos Verdes Water Company, was error. In support of its contention The Company claims the pro rata apportionment of the price paid for the six water systems it acquired in 1960, by which $14,865,000 thereof was allocated to the purchase of The Sweetwater System, was improper. The method used to make the allocation is reasonable; the qualifications of the witness supporting its use and the results obtained, under the evidence, were subjects for determination by the trial court in the exercise of its judicial discretion; the opinions of these witnesses were admissible; and substantial evidence supports their conclusions. The Company's witness, Mr. Barr, testified, in his opinion, the 1966 sale should not be considered in determining the present value of The Sweetwater System, but if it were considered at least 50 percent of the 1966 purchase price, i.e., approximately $21 million, should be allocated to the purchase of that system. Under the circumstances in this case, a proration of the 1966 purchase price for the purpose of allocating a portion thereof to the acquisition of The Sweetwater System was permissible (cf. *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 501-503), and admission of the evidence respecting such was a determination subject to an exercise of judicial discretion (gen. see *Decter* v. *Stevenson Properties, Inc.,* 39 Cal.2d 407, 420 [247 P.2d 11]; *Estate of Ades,* 81 Cal.App.2d 334, 342 [184 P.2d 1]).

Comparable sales furnish market data used in applying the market data approach to an opinion or determination of market value. Admission of evidence of such sales is authorized by Evidence Code sections 815 and 816. Whether a particular sale is comparable and evidence thereof should be admitted are determinations subject to an exercise of judicial discretion by the trial court, acting under the general criterion favoring admissibility where the evidence may be fairly considered as "shedding light" on the market value of the property condemned (Evid. Code, § 816; *City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 483; *People* ex rel. *Dept. Pub. Wks.* v. *Reardon,* 4 Cal.3d 507, 512 [93 Cal.Rptr. 852, 483 P.2d 20]; *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 500-501; *City of Pleasant Hill* v. *First Baptist Church, supra,* 1 Cal.App.3d 384, 415, 417), and absent a showing of abuse of discretion its determination will not be interfered with on appeal. No abuse of discretion is shown in the case at bench. Both sales shed light on the attitude of buyers of public utilities to pay more therefor than a value thereof based on the capitalization-of-income approach. The court, as indicated in the trial judge's memorandum decision, relied on the 1966 sale of The Sweetwater System as a basis for rejecting the maximum limits placed on its market value by The Irrigation District's valuation witnesses. Under these circumstances, The Company's objection is anomalous. However, assuming the court also relied on these sales as a basis for rejecting the opinions of The Company's valuation witnesses, the admissibility of evidence respecting such was not an abuse of discretion; both sales may be fairly considered as "shedding light" on the market value of the property condemned (Evid. Code, § 816; *City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 482 and cases cited *ante*).

The Company's contention the court erred in denying it reimbursement for expenses incurred in the preparation and presentation of its case on the issue of just compensation, other than those statutorily allowed as court costs, is premised on the claim eminent domain proceedings condemning a public utility should be excepted from the general rule stated in *County of Los Angeles* v. *Ortiz, supra,* 6 Cal.3d 141, 143-146, 148-149 [98 Cal.Rptr. 454, 490 P.2d 1142, 68 A.L.R.3d 538], which held such expenses were not recoverable. The rationale of the decision in *Ortiz* forecloses such an exception. No error occurred.

The Company, in writing, requested "the court to make special findings of fact on the following *ultimate* issues" (italics ours), directed

primarily to a determination of issues of fact involved in the application of approaches to a determination of market value, including the results of calculations incident to such determination. The court denied the request. The Company assigns the denial as prejudicial error.

The rules governing findings of fact in the case at bench are prescribed by Code of Civil Procedure section 632, as adopted in 1968 and 1969,[19] and section 634, as adopted in 1959 and amended in 1968, which have been the subject of many decisional interpretations. The following general applicable rules are derivative of the code sections and these interpretative decisions.[20] Findings must be made on all material issues of fact raised by the pleadings or the evidence, unless waived; and have been characterized either as general findings or special findings, the

---

[19]Some of the language in present section 632 appeared in an amendment adopted in 1969.

[20]The following are some of the interpretative cases on which we base our concept of the presently applicable general rules: *Guardianship of Brown,* 16 Cal.3d 326, 332 [128 Cal.Rptr. 10, 546 P.2d 298]; *Coleman Engineering Co.* v. *North American Aviation, Inc.,* 65 Cal.2d 396, 410 [55 Cal.Rptr. 1, 420 P.2d 713]; *Moreno* v. *Jessup Buena Vista Dairy,* 50 Cal.App.3d 438, 447 [123 Cal.Rptr. 393]; *Morris* v. *Thogmartin,* 29 Cal.App.3d 922, 928-929 [105 Cal.Rptr. 919]; *In re Marriage of Warren,* 28 Cal.App.3d 777, 784-785 [104 Cal.Rptr. 860]; *San Luis Obispo Bay Properties, Inc.* v. *Pacific Gas & Elec. Co.,* 28 Cal.App.3d 556, 566 [104 Cal.Rptr. 733]; *Shell Oil Co.* v. *Allied Constr. & Eng. Co.,* 22 Cal.App.3d 1, 4-5 [98 Cal.Rptr. 922]; *Ball* v. *American Trial Lawyers Assn.,* 14 Cal.App.3d 289, 307 [92 Cal.Rptr. 228]; *Whitney Inv. Co.* v. *Westview Dev. Co.,* 273 Cal.App.2d 594, 604 [78 Cal.Rptr. 302]; *Kanner* v. *Globe Bottling Co.,* 273 Cal.App.2d 559, 567-568 [78 Cal.Rptr. 25]; *Shepherd* v. *DeVille Engineering Constr. Co.,* 268 Cal.App.2d 596, 605 [74 Cal.Rptr. 174]; *Anderson* v. *Southern Pac. Co.,* 264 Cal.App.2d 230, 234 [70 Cal.Rptr. 389]; *Duff* v. *Duff,* 256 Cal.App.2d 781, 785-786 [64 Cal.Rptr. 604]; *DeArmond* v. *Southern Pacific Co.,* 253 Cal.App.2d 648, 658 [61 Cal.Rptr. 844]; *Call* v. *Alcan Pacific Co.,* 251 Cal.App.2d 442, 448 [59 Cal.Rptr. 763]; *Garber* v. *City of Los Angeles,* 226 Cal.App.2d 349, 355 [38 Cal.Rptr. 157]; *Culbertson* v. *Cizek,* 225 Cal.App.2d 451, 465 [37 Cal.Rptr. 548]; *29 Palms Van & Storage* v. *L.A. Met. Transit Authority,* 221 Cal.App.2d 183, 186 [34 Cal.Rptr. 430]; *Ortiz* v. *Avila,* 222 Cal.App.2d 786, 790-791 [35 Cal.Rptr. 522]; *Ward* v. *McMahan's of Torrance,* 215 Cal.App.2d 511, 517 [30 Cal.Rptr. 213]; *Foster* v. *Keating,* 120 Cal.App.2d 435, 453 [261 P.2d 529]; *Elsbach* v. *Mulligan,* 58 Cal.App.2d 354, 368 [136 P.2d 651]; and *Klegman* v. *Moyer,* 91 Cal.App. 333, 347 [266 P. 1009]. The Company, in support of its position, cites the decisions in three cases, i.e., *City of Torrance* v. *Superior Court,* 16 Cal.3d 195, 207, fn. 8 [127 Cal.Rptr. 609, 545 P.2d 1313]; *Hemmerling* v. *Tomlev, Inc.,* 67 Cal.2d 572, 576 [63 Cal.Rptr. 1, 432 P.2d 697]; and *Pacific Tel. & Tel. Co.* v. *Public Util. Com.,* 62 Cal.2d 634, 647-648 [44 Cal.Rptr. 1, 401 P.2d 353], which are inapposite. *City of Torrance* did not involve an appeal from a judgment in condemnation; *Hemmerling* was a condemnation, in which the trial court omitted to find separately the "value" of a separate interest in real property which Code of Civil Procedure section 1248, subdivision 1, expressly provides shall be separately assessed; and *Pacific Tel. & Tel. Co.* involved the review of a decision of the Public Utilities Commission modifying telephone rates, the reference therein respecting the requirements of findings by that commission relates to those imposed by section 1705 of the Public Utilities Code (1961) and, contrary to The Company's assertion, does not liken that code section to sections 632 and 634 of the Code of Civil Procedure.

former having been referred to as findings of ultimate facts and the latter as findings of evidentiary or probative facts. The findings made by the court in the case at bench are findings of ultimate facts (*City of Signal Hill* v. *Wyse,* 9 Cal.App.2d 641, 642 [50 P.2d 1076]; see also *City of Hayward* v. *Mohr,* 160 Cal.App.2d 427, 430 [325 P.2d 209]); determine the only issues of fact raised by the pleadings, i.e., what is just compensation for taking the property condemned and what is the severance damage resulting from that taking; and may be referred to as general findings. The findings requested by The Company, which it refers to as special findings on ultimate issues, are special findings on issues allegedly raised by the evidence.[21] Special findings are required only on material issues of fact. The trial of an action involves the determination of issues of ultimate fact, i.e., those generally arising from the statement and denial of facts essential to a cause of action or defense, and the determination of a chain of subsidiary issues of evidentiary or probative facts upon which a determination of the issues of ultimate fact are dependent. The purpose of the rule prescribed by section 634 which, in effect, requires special findings, was set forth in *Morris* v. *Thogmartin, supra,* 29 Cal.App.3d 922, 928-929, where the court quoted from other decisions, saying: " 'It is evident from the background of the legislation [i.e., Code Civ. Proc. § 634] that its purpose was to discourage the mere finding of so-called ultimate facts when such method left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case. The purpose of the amendment was to compel the trial judge, when requested, to make findings on specified *material* issues of fact. . . .'

 " '. . . . . . . . . . . . . . . . . . . . . .

 ". . . 'The broad purpose of the amendment [i.e., to Code Civ. Proc. § 634] seems to have been to alleviate the frustration of losing litigants and their attorneys confronted with noncommunicative trial judges . . . who frequently (with the aid of successful counsel) couched their findings of fact in terms so "ultimate" that it was extremely difficult, if not impossible, to determine either the factual basis or legal theory of the decision. . . .'

 " . . . 'The purpose of section 634 "was to discourage the mere finding of so-called ultimate facts when such method left counsel and the

---

[21]The request for special findings was made in the manner and within the time prescribed by section 634.

appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case. The purpose of the amendment was to compel the trial judge, when requested, to make findings on specified *material* issues of fact." ' . . .

" . . . 'A finding on a subsidiary fact probative of the ultimate fact can be material.' " [Italics ours.] Whether a fact or an issue of fact is material within the meaning of the rule must be determined in the light of the purpose of the rule. In section 634 the issue of fact upon which a special finding must be made is identified by the following language: "When . . . the court has not made findings as to all facts *necessary to support the judgment* . . . and the record shows that such omission . . . was brought to the attention of the trial court . . . ." [Italics ours.] Special findings are not required "as to every minute matter on which evidence is received at the trial . . . ." (*Coleman Engineering Co.* v. *North American Aviation, Inc., supra,* 65 Cal.2d 396, 410.) ▮ A special finding upon a subsidiary issue of fact is required only when it is a direct issue in the chain of determination of subsidiary issues upon which the finding of the ultimate fact depends. A request for a special finding on a subsidiary issue of fact which is remote in the chain of determination of the ultimate fact does not serve the purpose of the rule.[22] Thus, issues of fact incident to a determination whether an opinion on market value by a valuation witness in an eminent domain action should be accepted or rejected, in whole or in part, and the weight, if any, to be given that opinion in determining the ultimate issue of market value, are remote in the chain of determination and without the scope of the purpose of the rule requiring special findings upon request. A special finding on an issue of fact material to the application of a principle of law the court has rejected would be superfluous and not required (*Kanner* v. *Globe Bottling Co., supra,* 273 Cal.App.2d 559, 567-568). Findings of fact relating the process of a calculation which is the basis of an ultimate fact, ordinarily, are not required (*Klegman* v. *Moyer,* 91 Cal.App. 333, 347 [266 P. 1009]). However, this rule does not apply to a case involving a determination of separate "items" of damage, separately pleaded, each dependent upon a determination of separate issues of fact (*29 Palms Van & Storage* v. *L.A. Met. Transit Authority, supra,* 221 Cal.App.2d 183, 185-186—where the court converged a determination of all of the issues into a single finding

---

[22]In *DeArmond* v. *Southern Pacific Co.,* 253 Cal.App.2d 648, 659 [61 Cal.Rptr. 844], the court quoted from an article in the State Bar Journal by Harry W. Horton explaining the history and purposes of section 634 in which the author stated: The special findings requested under that section should have a " '*direct* bearing on the conclusion of law to be applied.' " (Italics ours.)

of damage in a single amount.) The nonapplication of the latter situation to the case at bench is apparent in that elements of value comprising market value enter into a determination of market value only as factors considered by the hypothetical buyer and seller in agreeing upon a price for the property which is the subject under consideration. Market value is not the product of a calculation in which the money value of separate elements of value are determined and totaled. ■ Where damages are the product of interwoven elements, the court is not required to separately assess the damage attributable to each element (*Foster* v. *Keating,* 120 Cal.App.2d 435, 453-454 [261 P.2d 529]; *Elsbach* v. *Mulligan, supra,* 58 Cal.App.2d 354, 368).

■ Unless a party requests a special finding of fact, or otherwise brings its omission to the attention of the trial court, on appeal it will be implied from a general finding if necessarily included in that finding and supported by substantial evidence (*In re Marriage of Warren,* 28 Cal.App.3d 777, 785 [104 Cal.Rptr. 860]; *Whitney Inv. Co.* v. *Westview Dev. Co., supra,* 273 Cal.App.2d 594, 604).

In addition, it is well settled if "[f]rom the facts found, and from the judgment ordered, it is evident, in the light of the entire record, that if more complete findings had been made they would have been adverse to the contentions of the appellant . . . the failure to find further is not a ground for . . . reversal . . . ." (*Hulen* v. *Stuart,* 191 Cal. 562, 572 [217 P. 750]; see also *Krasky* v. *Wollpert,* 134 Cal. 338, 342 [66 P. 309]; *Kaneda* v. *Kaneda,* 235 Cal.App.2d 404, 413 [45 Cal.Rptr. 437].)

■ An appellant seeking a reversal upon the ground the trial court failed to make a required special finding on an issue of fact, has the burden of directing the attention of the appellate court to the evidence on the issue; and of showing such evidence, considered in the light most favorably to appellant's position, will support a finding of fact which, in turn, will support a reversal of the judgment.

We consider The Company's contention denial of its motion for special findings was prejudicial error in the light of the foregoing principles of law and the state of the record in the case.

■ Although the written memorandum decision of a trial judge may not be substituted for findings of fact, it may be used to show the process used and the legal principles applied by the trial court in

reaching its decision. In the case at bench, the process used and the legal principles applied in determining the issue of just compensation are outlined in the trial judge's memorandum decision, which shows the court (1) applied, as the measure of just compensation, the general market value rule under which market value is the highest price a hypothetical, knowledgeable, willing buyer and seller would agree upon in an "open market" transaction, the market being open to public agencies as well as private investors; (2) believed the hypothetical buyer and seller, in reaching an agreement as to price, would consider the capitalization-of-income, market-data and reconstruction-cost-new-less-depreciation approaches to value, giving major, but not exclusive, consideration to the capitalization-of-income approach and minor consideration to the reconstruction-cost-new-less-depreciation approach, and would consider an adjustment upward of the value of the property, based on the capitalization-of-income approach, in the light of (a) a higher valuation based on the reconstruction-cost-new-less-depreciation approach, (b) the data furnished by the prior Sweetwater System and Palos Verdes system sales, (c) the "going concern" value of the property as an operating enterprise, (d) a probability the allowable rate of return on investment would be raised by the Public Utilities Commission in the reasonably foreseeable future, (e) a probability part of the land might be released from public utility service as surplus and sold, and (f) the historical fact the price paid by public agencies for public utilities is higher than the price paid by private investors; (3) related the factors which the hypothetical buyer and seller would consider in reaching an agreement as to price to the testimony and opinions of the valuation witnesses in the case and, in the light thereof, concluded the price to which such a buyer and seller would agree was more than the highest amount expressed in any opinion of market value by The Irrigation District's valuation witnesses and less than the lowest amount expressed in any opinion of the market value by The Company's valuation witnesses; and (4) as a matter of judgment, found the price to which the hypothetical buyer and seller would agree, based on all of the valuation opinions in the case, was the sum of $14,250,000.

Noteworthy, from the record, is the absence of a request for any special findings on probative issues directly related to an application of the general market value rule, which was the measure applied in determining the ultimate issue of just compensation. Thus, by way of example, there was no request for a finding of fact directed to a determination respecting the factors the hypothetical buyer and seller

would consider in agreeing upon the price to be paid for The Sweetwater System; or respecting the fact whether the market in which they negotiated was a market that included public agencies as prospective purchasers. In the absence of a request for special findings it must be assumed, under the established rule, the hypothetical buyer and seller, in reaching an agreement upon price, would consider, at least, each of the factors the trial judge believed they would consider, as indicated in his memorandum decision; and the market in which they negotiated their agreement was a market open to public agencies as well as private investors.

Initially we note, The Company has not directed our attention to the evidence on the issues of fact upon which they request special findings, nor has it shown whether a fact supported by such evidence would support a reversal of the judgment.

Of the 15 claimed issues of fact upon which the court was requested to make findings, one of them sought a finding of the fair market value of the property condemned. The finding "just compensation to be paid for the property condemned is the sum of $14,250,000.00" is the equivalent of a finding of market value. The additional finding requested would be superfluous (*Kanner* v. *Globe Bottling Co., supra,* 273 Cal.App.2d 559, 567; *City of Signal Hill* v. *Wyse, supra,* 9 Cal.App.2d 641, 642). Denial of the request was proper.

Another request sought a finding of the value of the property to The Irrigation District in the light of its freedom from control by the Public Utilities Commission and from federal, state and local tax status.[23] The value of property to the condemnor is not its market value or the value for which compensation must be paid (*People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc., supra,* 253 Cal.App.2d 870, 880-881; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 754-755). Property taken by eminent domain has only one market value (*City of Napa* v. *Navoni,* 56 Cal.App.2d 289, 298-299 [132 P.2d 566]). Denial of the request was not error.

Also requested was a special finding on the claimed issue of the market value of The Company's land and land rights being condemned

---

[23]It should be noted, the "freedom from control" to which The Company directs attention may be offset by the obligation of The Irrigation District to serve the public without profit, to pass on to the public any savings attributable to its nontax status and to fix its rates for service accordingly.

in their natural and unencumbered state. There was no issue. The parties stipulated to the fact. Denial of the request was not error (*Rossi* v. *Hackett*, 190 Cal.App.2d 400, 406 [12 Cal.Rptr. 12]).

Seven requests involve the reconstruction-cost-new-less-observed-depreciation approach and sought findings of the reconstruction cost new of the improvements on the land being condemned, the replacement cost new of those improvements, the value of the owner's construction costs for the property, the value of The Company's franchises and consents and of its books, records and documents, the value of the going concern of the property, and the value of the contributed plant not included in the rate base, all on the date of valuation. In substance, these requests seek separate money value findings respecting designated elements of value. The Company's valuation witnesses testified respecting these matters as a part of their calculations based on the reconstruction-cost-new-less-observed-depreciation approach to valuation; and based their opinions of "just compensation" on that approach and those calculations. The court, in the exercise of its discretion and the discharge of its duty to determine the weight to be given opinions of value and the methods of approach to value, rejected the opinions of The Company's valuation witnesses to the extent they set limitations on the minimum market value of the property condemned; and rejected the use of the reconstruction-cost-new-less-observed-depreciation approach for a determination of market value except in a limited degree. These conclusions did not involve determinations of material issues of fact as hereinbefore defined. Whatever money amounts the court may have found to be the value of the separate elements or items of value described in these particular requests would not demonstrate an abuse of discretion in rejecting the opinions of The Company's valuation witnesses or the approach they used in reaching those opinions. The Company has not shown in what manner or to what extent any finding on the issues to which these requests for findings are directed would support a contention on appeal the judgment should be reversed, assuming the evidence would support such a finding. Likewise, there is no showing of any basis for a distinction between the reconstruction cost of improvements and the replacement cost of improvements, or a separate finding as to each of these costs. It appears to be assumed the failure to make a special finding on a claimed issue of fact is reversible error. This is a false assumption.

 Two requests involve the market data approach, and seek a finding of the price paid by The Company in 1966 for the condemned

property, i.e., The Sweetwater System, the rate base of that property at that time, and the price paid for the Palos Verdes Water Company. The record establishes the existence of an issue of fact respecting the amount of the allocation to The Sweetwater System of the total price paid for the six systems purchased by The Company in 1966. The testimony of The Irrigation District's witness, Bookman, would support a 36 percent allocation, whereas the testimony of The Company's witness, Barr, would support a 50 percent to 60 percent allocation. As heretofore noted, the court used the market data approach as a basis for rejecting the opinions of The Irrigation District's valuation witnesses to the extent those opinions imposed a maximum on market value, which was beneficial rather than detrimental to The Company's position. In any event, the price of a claimed comparative sale is only one of several factors involved in using the market data approach, the purpose of which is to shed light on the ultimate issue of market value. Findings of fact involved in the process of weighing these factors in relation to the issue of market value are not directly related to the ultimate fact, and compelling such does not serve the purpose for requiring special findings on evidentiary issues. The Company has not directed our attention to the evidence on the claimed rate base of The Sweetwater System on the date of its 1966 sale or on the issue of the price paid for the Palos Verdes Water Company. Whether, in either instance, an issue of fact exists and whether it is a material issue within the scope of the rule requiring special findings, is not shown. Denial of the requests was not error.

■ The remaining three requests involve the capitalization-of-income approach and seek findings on the rate base of the condemned property, the capitalized value of the actual earnings of The Company and the capitalized value of the hypothetical earnings of The Company based on rate increases that could have been reasonably anticipated, all as of the date of valuation. By virtue of its relation to other issues, we are familiar with the fact the calculations by The Irrigation District's valuation witnesses involved rate bases in different amounts and resulted in different opinions of capitalized value. Whether the court accepted these calculations in whole or in part, and whether, in doing so, it abused its discretion, are not issues of fact upon which the trial court, on request, should have made special findings; nor does their determination involve issues of fact directly related to the ultimate fact of market value.

■ The court, in an eminent domain action, must premise its determination of the "value of the property" upon the opinions of

designated valuation experts (Evid. Code, § 813). In determining the weight to be given such opinions, the court is not required to determine the monetary value of the property based on separate applications of each approach to value used by the witnesses in reaching their opinions. Where the capitalization-of-income approach is used, the court is not required to make an independent determination of the value of the property based on its calculations respecting the factors included in an application of that approach. The same rule applies where the reproduction or replacement-cost approach (Evid. Code, § 821) is used. The court is not an appraiser; does not make a determination of market value based on its opinion thereof using the trinity of appraisal approaches or any other method; instead, it determines the market value of the property based on the opinions of the valuation witnesses.

## CROSS-APPEALS

The cross-appeals by The Irrigation District and The City seek a modification of that part of the judgment awarding The Company $60,000 for the loss of unbilled revenues and customer accounts receivable which will result from taking the property condemned; and awarding $175,000 as severance damages.

The cross-appellants contend the award for the loss of unbilled services and customer accounts receivable was improper because these items were expressly excluded from and not a part of the property taken; and, in any event, any loss thereof is a noncompensable injury.

The award is not for taking the unbilled revenues and customer accounts receivable but for the damage sustained because in taking the total enterprise, less these items, The Irrigation District takes from The Company its ability to enforce payment thereof through refusal to furnish services unless payment is made, which, in the light of the comparatively small amount involved in each account, is the only practical means of compelling payment.

The trial judge, as appears from his memorandum decision and statements at the hearing on the motion for a new trial, concluded taking the means of enforcing payment of unbilled revenues and customer accounts receivable was a factor the hypothetical buyer and seller would consider in reaching an agreement on the price to be paid for the property taken, but he would consider it as a separate price item, i.e., an

addition to the price which otherwise would be agreed upon; expressed the belief this item, which he referred to as "the loss of unbilled revenues and customer accounts receivable" in the sum of $60,000, did not fit within "the category of severance damage"; as a "practical approach" and "in fairness to all," gave it separate treatment; and on the hearing of the motion for new trial, expressed his willingness to modify the judgment by adding $60,000 to the general amount of just compensation awarded and striking it as a separate item, but neither side requested the modification.

Substantial evidence supports the conclusion when The Irrigation District takes the property condemned The Company will not be able to collect unbilled revenues and unpaid customer accounts receivable in the total sum of $60,000. The taking of The Company's right to enforce payment of its accounts receivable is a compensable item of damage (*Rose v. State of California, supra,* 19 Cal.2d 713, 729).

The loss sustained could have been treated as severance damage. The revenues and accounts receivable were part of the bundle of property and rights identified as a water system, public utility or enterprise; were excluded from the taking, and sustained a depreciation in worth because taking all of the other property and rights of the water system deprived The Company of the right to enforce payment thereof by refusing service to the customers involved.

The right to severance damage in an eminent domain action, at the time of the taking at bench, was governed by former section 1248, subdivision 2, of the Code of Civil Procedure. Issues concerning severance damage generally arise in an action for taking land which is part of a larger parcel and are governed by rules particularly applicable to such a taking, including a method of ascertaining such damage (*People v. Ricciardi,* 23 Cal.2d 390 [144 P.2d 799]; gen. see *Community Redevelopment Agency v. Abrams, supra,* 15 Cal.3d 813, 833-834, 837). However, the code section applied to "property to be condemned" and was not limited to *land* to be condemned.[24] On the other hand, in the action at bench it was reasonable to apply the general market value rule to the situation by including among the factors the hypothetical buyer and seller would consider in reaching an agreement as to price the loss the seller would sustain by virtue of the sale or, stated otherwise, the

[24]The owner of a public utility taken by an eminent domain action is vouchsafed " 'just compensation . . . for [its] lands, property *and rights.*' " (*Community Redevelopment Agency v. Abrams, supra,* 15 Cal.3d 813, 820-821, fn. 6.)

value of the right to enforce payment of customer accounts receivable by refusing utility services, which is one of the rights condemned.

Under the circumstances, the difference between categorizing the item of compensation the court denominated the loss of unbilled revenues and customer accounts receivable as severance damage, a separately stated item of just compensation or a factor to be considered in determining the market value of the condemned property, i.e., the water system, is the difference between "Tweedledee and Tweedledum." No prejudice is shown. The contention is without merit.

 Cross-appellants' contention the court erred in awarding $175,000 severance damages presents a different picture. The Company's Sweetwater System and Coronado System, although separate water systems, jointly use leased office facilities at Chula Vista in which The Company has installed fixtures, i.e., cooling, heating, lighting and miscellaneous structures and office equipment, which are a part of the property condemned; and also jointly use the office and other facilities, i.e., welding shop, meter department, storage space, truck service center and gasoline station, together with appropriate equipment, on its land at the Chula Vista Operations Center, all of which also are part of the property condemned. The fixtures, improvements and equipment were valued by a valuation witness applying the reconstruction-cost-new-less-depreciation method. The land was valued on the basis of the market value fixed by The Company's land appraiser. A percentage of the values thus obtained, in the language of the valuation witness, "is the additional cost which the company must incur to be spent in the Coronado District to render the same level of service to its Coronado customers that they are now receiving." This cost, amounting to $303,000, was claimed as severance damage. The court allowed $175,000.

Basic to any allowance of severance damage under former Code of Civil Procedure section 1248, subdivision 2, is the existence of unity of the property taken and the property not taken, including unity of title, contiguity and unity of use (*City of Los Angeles* v. *Wolfe,* 6 Cal.3d 326, 330 [99 Cal.Rptr. 21, 491 P.2d 813]). Although there is unity of title between the Sweetwater and Coronado Systems, for purposes of severance damage they are not parts of a single parcel. To the contrary, they are separate systems, separate utilities and separate enterprises. Each is a separate unit for rate-making purposes. Each has a separate rate base. The Chula Vista office and Operations Center facilities are a

part of The Sweetwater System and not a part of the Coronado System. The Company's investment in these facilities is included in the rate base of The Sweetwater System and not of the Coronado System. The profits computed on this rate base with resultant rates are paid by the consumers of The Sweetwater System and not of the Coronado System. The unity of the two water systems does not equate the unity required of two parcels of land forming a single parcel for purposes of determining severance damage (gen. see *Wisconsin Power & Light Co.* v. *Public Service Com'n,* 219 Wis. 104 [261 N.W. 711, 716]; 2 Orgel, Valuation Under Eminent Domain, pp. 172, 173).

It is established both The Sweetwater System and the Coronado System jointly used the facilities at Chula Vista. Although the evidence does not satisfactorily establish the fact, for the purpose of argument it may be assumed the total investment in these facilities was not essential to the separate use thereof by either system; the joint use would constitute a saving by each system; and when the use thereof by the Coronado System is terminated, because of the taking, The Company will lose that saving; and this loss, under appropriate pleading and proof, might be found to be compensable even though not categorized as severance damage (gen. see *People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc., supra,* 253 Cal.App.2d 870, 880). It is a direct loss The Company will sustain by virtue of the taking. When presented with a proper pleading and proof background, the court would have the duty to determine whether such a loss is compensable and should be included in an award of just compensation (gen. see *County of Los Angeles* v. *Ortiz, supra,* 6 Cal.3d 141, 145). The market value of the subject facilities was included in the market value of The Sweetwater System and, under the capitalization-of-income approach, was based on the productivity of those facilities as a part of The Sweetwater System and not as a part of the Coronado System, although they participated in the production of income for the latter system. Thus it would appear, under the capitalization-of-income approach, The Company was not compensated for that part of the facilities on which the productivity of the Coronado System was based. Evidence tending to prove the value of substitute facilities for the Coronado System does not provide a basis for apportionment of the difference between the value of the Chula Vista facilities when limited in use to The Sweetwater System and its value when used by both systems.

The issue of the claimed loss resulting from the separation of use was litigated without specific pleading allegations and without objection.

Unless the severance damage award is affirmed, The Company should be permitted to amend its pleadings and present evidence on this theory of damage. However, in the light of The Irrigation District's expressed wish to abandon its appeal rather than undertake a further trial on the issue of the so-called severance damage, we will affirm the award on this basis.

The award of just compensation in the case at bench is within the range testified to by expert witnesses. All elements of value were considered by the trier of fact in weighing the testimony of these witnesses. The record has presented all sides with the opportunity to present their contentions on appeal. In ultimate substance The Company believed the reconstruction-cost-new-less-observed-depreciation approach should be adopted, or given preference, in determining "value," as a matter of law; The Irrigation District relied upon the capitalization-of-income approach; and their respective valuation witnesses premised their opinions accordingly. The court, in the exercise of its discretion, believed greater weight should be given to the capitalization-of-income approach but also relied on other approaches. Its conclusion will not be interfered with on appeal absent a showing of abuse of discretion. No such abuse is shown and the judgment should be affirmed. (*City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 491-492; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Covich, supra,* 260 Cal.App.2d 663, 669-670; *City of Downey* v. *Royal,* 215 Cal.App.2d 523, 529-530 [30 Cal.Rptr. 159]; *City of Fresno* v. *Hedstrom, supra,* 103 Cal.App.2d 453, 461; *Employees' Participating Assn.* v. *Pine,* 91 Cal.App.2d 299, 302-303 [204 P.2d 965]; *Joint Highway Dist. No. 9* v. *Railroad Co., supra,* 128 Cal.App. 743, 767; cf. *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564.)

Judgment affirmed.

Ault, Acting P. J., and Cologne, J., concurred.

The petition of the defendant and appellant for a hearing by the Supreme Court was denied December 22, 1976.